Kenneth C. LUMHOO and Jemel Anderson, Plaintiffs,

v.

THE HOME DEPOT USA, INC., James Duffy, Jose Camacho, Joseph Gervasi and John Clougher, Defendant.

No. CV00–5267(MLO).

United States District Court, E.D. New York.

Sept. 26, 2002.

L. Susan Scelzo Slavin, Michael Gapinski, Marc Andrew Kramer, Jericho, NY, for Plaintiffs.

Christopher P. Reynolds, Debra Morway, Morgan, Lewis & Bockius LLP, New York, NY, for Defendant.

### MEMORANDUM AND ORDER

ORENSTEIN, United States Magistrate Judge.

Plaintiffs Kenneth C. Lumhoo ("Lumhoo") and Jemel Anderson ("Anderson") (collectively "Plaintiffs") bring this employment discrimination action against defendants The Home Depot USA, Inc. ("Home Depot"), James Duffy ("Duffy"), Jose Camacho ("Camacho"). Joseph Gervasi ("Gervasi") and John Clougher ("Clougher") alleging discrimination, retaliation, disparate treatment, a hostile work environment and the deprivation of overtime

compensation on the basis of Plaintiffs' race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") as amended, 42 U.S.C. §§ 2000e *et seq.*; 42 U.S.C. § 1981 and § 1981(a); the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (McKinney 2001) ("NYSHRL") and New York common law. Defendants move the Court[1] for an order granting summary judgment pursuant to Fed. R.Civ.P. 56 and dismissing the amended complaint (hereinafter the "complaint"). For the reasons set forth below, the Court grants Defendants' motion in part and denies Defendants' motion in part.

In addition, in light of this Court's decision, the Court denies Defendants' motion to strike portions of Plaintiffs' Affidavits and Rule 56.1 Statements in Opposition to Defendants' Motion for Summary Judgment as moot.

### FACTUAL BACKGROUND

The following facts are presented in the light most favorable to the Plaintiffs. *See Brennan v. Metropolitan Opera Ass'n Inc.*, 192 F.3d 310, 316 (2d Cir.1999); *Ertman v. United States*, 165 F.3d 204, 206 (2d Cir.1999).

On April 15, 1999, Home Depot hired Anderson, an African–American male, to be an order puller[2] in its Valley Stream Store. (Pl. Anderson's 56.1 Statement at ¶ 1).[3] Home Depot hired Lumhoo, an African–American and Asian Pacific Islander

---

1. The parties have consented to disposition of this action by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (*See* Dkt. No. 30.).

2. As an order puller, Anderson's job was to gather all products necessary to fill an order and prepare them either to be picked up by or delivered to the customer. (Pl. Anderson's 56.1 Statement at ¶ 2). Anderson's responsibilities also included carefully packing orders to ensure that products did not get damaged,

loading delivery vehicles and using a forklift. (Morway Aff., Exh. G).

3. "Pl. (or Def.) 56.1 Statement at ¶ ___" refers to the respective plaintiffs' (or defendants') Local Civil Rule 56.1 Statement pursuant to Local Civil Rule 56.1(a) of the Local Civil Rules of the Southern and Eastern Districts of New York.

male, to be a truck driver[4] for its Brooklyn store on March 29, 1999. (Pl. Lumhoo's 56.1 Statement at ¶ 1). Thereafter, on July 5, 1999, Lumhoo, was transferred from Home Depot's store in Brooklyn to the Valley Stream store where he continued to work as a truck driver. (Pl. Lumhoo's 56.1 Statement at ¶ 2).

On September 19, 1999, Plaintiffs were transporting material to and from a delivery truck at the Valley Stream store. (Compl.¶ 41). During the course of the various transfers, material and equipment, including a certain forklift, blocked the lumber aisle in the Valley Stream store. (Compl. ¶ 41; Pl. Anderson's 56.1 Statement at ¶ 27; Pl. Lumhoo's 56.1 Statement at ¶ 34). Anderson requested defendant James Duffy,[5] Department Head of the Lumber Division of the Valley Stream store, to move the forklift and material that was blocking the aisle so that Plaintiffs could continue loading their truck. (Compl. ¶¶ 9, 42; Pl. Anderson's 56.1 Statement at ¶ 27; Pl. Lumhoo's 56.1 Statement at ¶ 34). Duffy ignored the request and walked away. (Compl. ¶ 42; Pl. Anderson's 56.1 Statement at ¶ 27; Pl. Lumhoo's 56.1 Statement at ¶ 34). Defendant John Clougher,[6] an Assistant Manager of the Valley Stream store, got on the forklift and began to move it out of the way, (Compl. ¶¶ 12, 42; Pl. Anderson's 56.1 Statement at ¶ 27; Pl. Lumhoo's 56.1 Statement at ¶ 34), but Lumhoo told Clougher to forget it and that Plaintiffs would use the lumber aisle to load the trucks, (Morway Aff., Exh. M).

As Anderson attempted to move the material through the lumber aisle with a fork-

lift, Duffy ran down the store aisle and yelled at Plaintiffs for allegedly damaging his lumber. (Compl. ¶ 43; Pl. Anderson's 56.1 Statement at ¶ 27; Pl. Lumhoo's 56.1 Statement at ¶ 34; Morway Aff., Exh. M). Anderson asked Duffy if he could stop yelling, and Duffy admonished Anderson for allegedly not wearing a seatbelt while on the forklift. (Compl. ¶ 44; Pl. Anderson's 56.1 Statement at ¶ 27; Pl. Lumhoo's 56.1 Statement at ¶ 34). When Anderson showed Duffy that he was wearing a seatbelt, Duffy walked away and stated, "You worthless niggers ... We'll deal with you later." (Compl. ¶ 44; Pl. Anderson's 56.1 Statement at ¶ 27; Pl. Lumhoo's 56.1 Statement at ¶ 34). Anderson responded angrily to Duffy. (Pl. Anderson's 56.1 Statement at ¶ 30).

Plaintiffs then saw Duffy speaking with Clougher, and Plaintiffs approached Clougher to explain to him what had occurred between Duffy and Anderson. ( Pl. Anderson's 56.1 Statement at ¶ 31; Pl. Lumhoo's 56.1 Statement at ¶ 34). However, defendant Joseph Gervasi,[7] an Assistant Manager of the Valley Stream store, came over to the group and told Anderson, to "Shut the fuck up. What you say don't mean nothing. You are nobody. You don't matter." (Compl. ¶ 44; Pl. Anderson's 56.1 Statement at ¶ 32; Pl. Lumhoo's 56.1 Statement at ¶ 34). Gervasi also told Anderson that Duffy was part of the management team and "what he says goes. You jump when [Duffy] says jump with no questions asked." (Compl.45).

---

4. As a driver, Lumhoo was responsible for delivering merchandise orders to customers. In addition, Lumhoo assisted customers in loading their vehicles and ensuring that shopping cars were available for customers' use. (Pl. Lumhoo's 56.1 Statement at ¶ 2).

5. Duffy is a Caucasian male. (Compl.¶ 41).

6. Clougher is a Caucasian male. (Compl.¶ 46).

7. Gervasi is a Caucasian male. (Compl.¶ 44).

Gervasi called defendant Jose Camacho,[8] the Manager of the Valley Stream store, at his home to apprise him of the situation and asked for permission to fire Anderson for insubordination and for failing to wear a seat belt in violation of Home Depot policy. (Pls. Memorandum of Law in Opp. at 6). After receiving permission, on that same day, Gervasi terminated Anderson's employment. (Compl. ¶ 46; Pl. Anderson's 56.1 Statement at ¶ 29; Pl. Lumhoo's 56.1 Statement at ¶ 39). Lumhoo asked Clougher to intervene in the situation, however Clougher declined, stating that while he knew what Duffy and Gervasi had done was wrong, he could not go against his co-workers. (Compl.¶ 46).

The following day, Camacho reviewed Anderson's termination notice and spoke to Gervasi about the previous day's incident. (Pl. Anderson's 56.1 Statement at ¶ 39). In addition, Plaintiffs met with Camacho in order to resolve the September 19, 1999 incident and requested that management discipline Duffy for his use of a racial epithet. (Compl. ¶ 47; Pl. Anderson's 56.1 Statement at ¶ 40).

Plaintiffs also reported to Sherma Nichols,[9] Assistant Manager of the Valley Stream Store and the person designated to hear harassment and discrimination complaints, the events surrounding Anderson's termination and Duffy's use of the term "worthless niggers." (Pl. Anderson's 56.1 Statement at ¶ 45; Pl. Lumhoo's 56.1 Statement at ¶ 40; Pls. Memorandum in Opp. at 5). Nichols directed Plaintiffs to reduce their complaints to writing, and she passed the written complaints on to Camacho. (Pl. Anderson's 56.1 Statement at ¶ 46; Pl. Lumhoo's 56.1 Statement at ¶ 41). Nichols also suggested that Anderson speak to Human Resources Manager Al DeLuca concerning this complaint. (Pl. Anderson's 56.1 Statement at ¶ 48; Pl. Lumhoo's 56.1 Statement at ¶ 43).

Plaintiffs went together to speak with DeLuca and gave him written statements about the September 19, 1999 incident. (Pl. Anderson's 56.1 Statement at ¶ 49; Pl. Lumhoo's 56.1 Statement at ¶ 45). Three weeks later, on October 12, 1999, DeLuca reinstated Anderson's employment to a position at the Home Depot's Ozone Park Queens store,[10] paid Anderson for the three week period of his termination and removed all documents concerning his termination from Company records. (Compl. ¶ 48; Pl. Anderson's 56.1 Statement at ¶¶ 50, 53–54; Pl. Lumhoo's 56.1 Statement at ¶ 46). DeLuca discussed the September 19, 1999 incident with Duffy and a memorandum referencing the incident and reiterating Home Depot's policy regarding discrimination was placed in Duffy's personnel file. (Pl. Anderson's 56.1 Statement at ¶ 51; Pl. Lumhoo's 56.1 Statement at ¶ 47; Morway Aff., Exh. J).

On October 22, 1999, Lumhoo filed a charge of employment discrimination based on race against defendant Home Depot with the Equal Employment Opportunity Commission ("EEOC") and the New York State Division of Human Rights ("NYSDHR") alleging an unlawful discriminatory practice based on Home Depot's failure to discipline an employee who made a racial comment in violation of Title VII and NYSHRL § 296. (Compl. ¶ 16; Morway Aff., Exh. M). On November 4, 1999, Anderson filed a charge of employment discrimination based on race against Home Depot with the EEOC and the NYSDHR

---

**8.** Camacho is a Hispanic/Puerto Rican male. (Morway Aff., Exh. M).

**9.** Nichols is an African–American female. (Defs. 56.1 Statement at ¶ 20).

**10.** On October 11, 1999, Lumhoo requested and received a transfer to Home Depot's Ozone Park store. (Pl. Lumhoo's 56.1 Statement at ¶ 31).

alleging that a racial slur asserted against him, his termination and his reinstatement to part-time employment constituted unlawful discriminatory practices in violation of Title VII and NYSHRL § 296. (Compl. ¶ 16; Morway Aff., Exh. M). The NYSDHR dismissed the charges for administrative convenience on May 30, 2000, and on June 8, 2000, the Department of Justice issued right to sue letters to each Plaintiff against defendant Home Depot. (Compl.¶¶ 17–18, Exhs. A & B).

On August 31, 2000, Plaintiffs commenced the instant action in the United States District Court for the Eastern District of New York alleging race discrimination arising from their employment at the Home Depot's Valley Stream store in 1999. Specifically, in the complaint. Plaintiffs allege in Counts 1 through 5 that Anderson's termination was discriminatory and/or retaliatory, in Counts 6 through 8 that both Anderson and Lumhoo were treated less favorably than white employees with respect to promotions, compensation, recognition and discipline, and in Counts 9 through 11 that both plaintiffs were subjected to a hostile work environment all in violation of Title VII, § 1981 and NYSHRL. Additionally, Plaintiffs allege in Count 12 that Defendants breached oral contracts with respect to overtime payment for hours worked in excess of eight hours per day.

Defendants now move for summary judgment pursuant to Fed.R.Civ.P. 56.

The underlying facts and applicable law surrounding each of Plaintiffs' allegations will be presented in the relevant discussion section below.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 36 (2d Cir.1994). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56).

In considering a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511. In doing so, "[t]he district court must draw all reasonable inferences and resolve all ambiguities in favor of the nonmoving party and grant summary judgment only if no reasonable trier of fact could find in favor of the nonmoving party." *Sutera v. Schering Corp.,* 73 F.3d 13, 15 (2d Cir.1995) (citation omitted).

While the Court is mindful that it must "[b]e especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case because the em-

ployer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999), it is clear that "summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 40 (2d Cir.1994); *see also Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985) ("The summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."); *Miller v. Taco Bell Corp.,* 204 F.Supp.2d 456, 458 (E.D.N.Y.2002) ("where an employer provides convincing evidence explaining its conduct, and the plaintiff's case rests on conclusory allegations of discrimination, the court may properly conclude that there is no genuine issue of material fact and grant summary judgment to the employer").

## I. Exhaustion of Administrative Remedies

■ As a threshold matter, Defendants contend that the causes of action in the federal complaint sounding in disparate treatment, retaliation and a hostile work environment in violation of Title VII (Counts 3, 6 and 9) are not properly before this Court because Plaintiffs failed to raise these claims in the administrative charges Plaintiffs had previously filed with the NYSDHR and EEOC. According to Defendants, Plaintiffs' administrative charges relate solely to the events of September 19, 1999, and Plaintiffs have raised for the first time in their federal complaint, additional Title VII discrimination claims of disparate treatment with respect to promotions, compensation, recognition and disciplinary measures. In addition, defendants contend that Plaintiffs claim for the first time in their federal complaint that

they were subjected to a hostile work environment prior to September 19, 1999 and that Anderson's termination was in retaliation for earlier alleged complaints of discrimination.

■ Plaintiffs may commence a Title VII employment discrimination action in federal court only after they have filed a timely complaint with the EEOC, or with "a State local agency with authority to grant or seek relief from such practice," and obtained a right-to-sue letter. 42 U.S.C. § 2000E–5(e) and (f); *see Fitzgerald v. Henderson,* 251 F.3d 345, 358–59 (2d Cir.2001) ("Title VII requires that an employment discrimination claimant pursue administrative procedures before commencing a lawsuit"); *Briones v. Runyon,* 101 F.3d 287, 289 (2d Cir.1996) (Plaintiffs raising claims under Title VII are required to "exhaust available administrative remedies in a timely fashion"). Exhaustion of administrative remedies is "an essential element of Title VII's statutory scheme," and is therefore a precondition to raising a Title VII claim in federal court. *Francis v. City of New York,* 235 F.3d 763, 768 (2d Cir.2000); *see Holtz v. Rockefeller & Co.,* 258 F.3d 62, 83 (2d Cir.2001) ("Exhaustion of remedies is a precondition to suit"). "The purpose of this exhaustion requirement is to give the administrative agency the opportunity to investigate, mediate and take remedial action." *Brown v. Coach Stores Inc.,* 163 F.3d 706, 712 (2d Cir.1998) (internal quotation marks and citation omitted).

■ Nonetheless, the Second Circuit has recognized that "claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir.2001) (per curiam)

(quoting *Shah v. New York State Dep't of Civil Service*, 168 F.3d 610, 614 (2d Cir. 1999); *accord Holtz*, 258 F.3d at 83). Claims that are raised for the first time in the district court may be considered reasonably related (1) "if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge[s] that w[ere] made," *Fitzgerald*, 251 F.3d at 359–60 (internal quotation marks and citation omitted); (2) where the claims allege "retaliation by an employer against an employee for filing an underlying claim of discrimination," *see Shah*, 168 F.3d at 614; and (3) where the claims allege subsequent acts that were "essentially the same as the allegedly wrongful conduct in the EEOC complaint," *Almendral v. N.Y.S. Office of Mental Health*, 743 F.2d 963, 967 (2d Cir.1984).

Of these three types of "reasonably related" claims, only the first has relevance in the instant matter, and Plaintiffs do not argue otherwise.[11] Specifically, Plaintiffs' contend that the disparate treatment, retaliation and hostile work environment claims are "reasonably related" to the allegations and specific incidents of discrimination contained in their administrative charges and should therefore be expected to fall within the scope of an investigation into the claims alleged in their NYSDHR and EEOC complaints. Plaintiffs' contention is not completely without merit.

"Reasonably related" in this circumstance "means that despite the claimant's having failed to specify the precise charge, the EEOC likely would have investigated the conduct complained of anyway." *Pemrick v. Stracher*, 67 F.Supp.2d 149, 170 (E.D.N.Y.1999). That being said, "the loose pleading allowance is not satisfied by vague, generalized statements. Specific factual allegations must be made in order for the EEOC to be able to investigate them reasonably." *Cooper v. Xerox Corp.*, 994 F.Supp. 429, 432 (W.D.N.Y.1998); *see also Findlay v. Reynolds Metals Co.*, 82 F.Supp.2d 27, 34 (N.D.N.Y.2000) ("Were we to permit such vague, general allegations, quite incapable of inviting a meaningful EEOC response, to define the scope of the EEOC investigation and thereby predicate subsequent claims in the federal lawsuit, such allegations would become routine boilerplate and Title VII's investigatory and mediation goals would be defeated.") (internal quotation marks and citation omitted).

In the case at hand, Plaintiffs' NYSDHR & EEOC complaints unambiguously limit Plaintiffs' claims to the events surrounding the September 19, 1999 incident. Thus, to the extent that Plaintiffs' claims of disparate treatment, retaliation and a hostile work environment arise out of the September 19, 1999 incident and could be expected to grow out of the charges made in the

---

**11.** The other two circumstances are inapplicable because (1) Plaintiffs filed their respective complaints with the NYSDHR and EEOC after plaintiff Anderson had already been terminated, the conduct complained of in the charges did not arise subsequent to the filing of the charges and therefore the retaliatory actions alleged by Plaintiffs could not have occurred in response to the administrative filing, *see, e.g., Francis v. Chemical Banking Corp.*, 62 F.Supp.2d 948, 960 (E.D.N.Y.1999) (holding the second type of "reasonably related" claim applies to retaliation claims that

are asserted after the employee files the administrative charge); *Pustilnik v. Hynes*, 1998 WL 813411, at *5 (E.D.N.Y. July 21, 1998) ("The retaliation exception applies only to claims of retaliation that are asserted in a federal complaint arising from the filing of an EEOC complaint"); and (2) the federal charges fail to allege any further incidents of discrimination carried out in precisely the same manner alleged in the NYSDHR and EEOC charges, *see, e.g., Almendral*, 743 F.2d at 967–68.

foregoing complaints, they are deemed exhausted.

For example, Lumhoo's administrative charge states in pertinent part:

1. I am Black.

2. On April 27, 1998[sic], I began working for the Respondent's store located at 101 Green Acres Road, Valley Stream, New York as Truck Driver. I have performed my job in a satisfactory manner.

3. On September 19, 1999. I was loading a truck with material with Jemel Anderson (Black), Order Puller. Jim Duffy (Caucasian), Department Head, blocked our loading aisles with his material and equipment. Mr. Anderson asked Mr. Duffy to move the material from the aisle so that we could continue loading our truck. Mr. Duffy ignored Mr. Anderson's request, and walked away. John "Doe" (Caucasian), Assistant Manager, began to remove the material by a forklift, but I told John to forget it and I would use the lumber aisle to load trucks. Mr. Anderson and I were moving the material through the lumber aisle when Mr. Duffy came running down the aisle screaming at us that we were damaging his lumber. Mr. Anderson told Mr. Duffy to stop yelling. Mr. Duffy then criticized Mr. Anderson for not wearing his seat belt. Mr. Anderson thereupon showed Mr. Duffy that he was wearing his seat belt. Mr. Duffy walked away mumbling the words "worthless Niggers." Mr. Anderson became very upset although I told him it is not worth it, and to just let it go. Later there was an altercation with Mr. Duffy, John, the Assistant Manager, and Joe Vaci (Caucasian), Assistant Manager. Mr. Vaci supported Mr. Duffy and terminated Mr. Anderson. I told John that he should have gotten involved in the matter and not let the problem worsen. John responded by stating that he could not go against his co-workers.

4. On September 20, 1999, I went to see Jose Commacho [sic] (Hispanic Puerto Rican), Store Manager, who was uninterested in resolving the matter and disciplining Mr. Duffy. That same day, I spoke to Sherma Malcolm (Black), Assistant Manager of Deliveries about the matter and she told me to speak to Al DeLuca (Caucasian), Human Resource Manager. I spoke to Mr. DeLuca and asked, and got, a transfer to the Ozone Park store. To date, Mr. Duffy has not been disciplined for his racial comment.

5. I am Black. Based on the foregoing, I charge the above-named Respondent with an unlawful discriminatory practice based on employment by not disciplining an employee, who made a racial comment because of my race and color.

(Morway Aff., Exh. M).

Similarly, Anderson's administrative charge states in pertinent part:

1. I am Black.

2. In May 1999[sic], I began working for the Respondent's store located at 101 Green Acres Road, Valley Stream, New York as a[sic] Order Puller. I have performed my job in a satisfactory manner.

3. On September 19, 1999, I was loading a truck with material with Kenneth Lumhoo (Black), Truck Driver. Jim Duffy (Caucasian), Department Head, blocked our loading aisles

with his material and equipment. I asked Mr. Duffy to move the material from the aisle so that we could continue loading our truck. Mr. Duffy ignored my request, and walked away. John "Doe" (Caucasian), Assistant Manager, began to remove the material by a forklift, but Mr. Lumhoo told John to forget it and he would use the lumber aisle to load trucks. Mr. Lumhoo and I were moving the material through the lumber aisle when Mr. Duffy came running down the aisle screaming at us that we were damaging his lumber. I told Mr. Duffy to stop yelling. Mr. Duffy then criticized me for not wearing my seat belt. I showed Mr. Duffy that I was wearing my seatbelt. Mr. Duffy walked away mumbling the words "worthless Niggers." I saw Mr. Duffy speaking [to] John, and I walked over to try to explain what had occurred between Mr. Duffy and me. Joe Vaci (Caucasian), Assistant Manager, walked over to our group and told me to "shut the hell up. What you say don't mean shit around hear [sic]." I asked Mr. Vaci why it is all right for Mr. Duffy to call us "out our name" and to disrespect us and it is okay. Mr. Vaci responded Yes and added that if our supervisor tells us to jump, we have to jump. About an hour later, I was summoned to the manager's office by Mr. Vaci. Mr. Vaci terminated me.

4. On October 12, 1999, I was telephoned by Al DeLuca (Caucasian), Human Resources Manager, and told that I could return to work at the Ozone Park, Queens, store. It should be noted that I was able to return to the Respondent as a part-time employee, and not as a full-time employee (I worked as a full-time employee at the Valley Stream store).

5. I am Black. Based on the foregoing, I charge the above-named Respondent with an unlawful discriminatory practice based on employment by being called a racial slur, being terminated, and then reinstated to part-time employment because of my race and color.

(Morway Aff., Exh. M).

Strikingly absent from both the NYSDHR & EEOC complaints are allegations that Plaintiffs were treated less favorably than similarly situated white employees with respect to promotions, compensation and recognition. Moreover, the alleged facts underlying Plaintiffs' administrative charges are notably distinct from the facts contained in the disparate treatment, retaliation and hostile work environment claims set forth in Counts 3, 6 and 9 of Plaintiffs' federal complaint. The administrative charges solely allege claims relating to the September 19, 1999 incident, the disciplinary measures surrounding that event and Anderson's reinstatement to an alleged part-time position three weeks following that event.

With the exception of Plaintiffs' allegations of disparate treatment with respect to disciplinary measures and Anderson's reinstatement to part-time employment, nothing in Plaintiffs' administrative filings suggests that Defendants subjected Plaintiffs to disparate treatment with respect to promotions, wages or other work-related benefits, (*see* Compl. ¶ 75), or that Defendants terminated Anderson in retaliation for earlier alleged complaints of discrimination, (*see* Compl. ¶ 67), or that Defendants subjected Plaintiffs to a hostile work environment and pervasive racial harass-

ment prior to September 19, 1999, (*see* Compl. ¶ 81). Rather, Plaintiffs' administrative complaints consist of a recitation of the alleged discriminatory incident that occurred on September 19, 1999 and charge defendant Home Depot with an unlawful employment discriminatory practice based on (1) Home Depot's failure to discipline an employee supervisor who made a racial comment because of Lumhoo's race and color; and (2) a Home Depot supervisor using a racial slur against Anderson, thereafter resulting in Anderson's termination and subsequent reinstatement to a part-time employment position because of Anderson's race and color.

Under these circumstances, an investigation into Plaintiffs' administrative charges would not fall within the scope of, nor would be reasonably expected to grow into an investigation of Plaintiffs' claims of retaliation for earlier complaints of discrimination or a hostile work environment prior to the September 19, 1999 incident or of disparate treatment with respect to promotions, compensation and recognition. *See, e.g., Ige v. Command Sec. Corp.*, 2002 WL 720944, at *6 (E.D.N.Y. Mar.12, 2002) ("An investigation into the underlying incidents of Plaintiff's disparate treatment claim would not lead an investigator to inquire about a claim of hostile work environment"); *Crespo v. New York City Transit Auth.*, 2002 WL 398805, at *8 (E.D.N.Y. Jan.7, 2002) (rejecting as unexhausted Plaintiffs' harassment and hostile environment claims because they "rely on different facts and embody different legal theories than the discrimination claims raised in the EEOC Charge [and] would not reasonably prompt an investigation into the facts that underlie her claims"); *Ghose v. Century 21, Inc.*, 108 F.Supp.2d 373, 376 (S.D.N.Y.2000) (holding Plaintiffs' claims of discrimination based on his association with African–American co-workers, a hostile work environment and retaliation

claims were not reasonably related to claims of racial and national origin discrimination that were alleged in Plaintiffs' original filing with the EEOC); *Findlay*, 82 F.Supp.2d at 34 (precluding Plaintiff from asserting disparate treatment claim because Plaintiff's EEOC complaints solely allege incidents underlying Plaintiff's hostile work environment and retaliation claims); *cf. Osier v. Broome County*, 47 F.Supp.2d 311, 319–21 (N.D.N.Y.1999) ("Plaintiff's conclusory allegations of 'sexual harassment' are insufficient to give defendants notice of the many incidents of a hostile work environment that she is now asserting in this lawsuit"); *Szarka v. Reynolds Metals Co.*, 17 F.Supp.2d 115, 124–26 (N.D.N.Y.1998) (holding a charge of retaliation cannot reasonably be expected to grow out of charges of sex and age discrimination)

In short, that portion of Plaintiffs' claims set forth in their federal complaint which charges disparate treatment with respect to promotions, compensation and recognition, or which claims a hostile work environment prior to September 19, 1999 or which alleges that Anderson's termination was in retaliation for earlier complaints of discrimination is not reasonably related to the claims Plaintiffs filed with the EEOC and the NYSDHR. Conversely, that portion of Plaintiffs' claims which arise out of the September 11, 1999 incident, including but not limited to Plaintiffs' claims of disparate treatment with respect to disciplinary measures surrounding that event and Anderson's reinstatement from an allegedly full-time position to a part-time position as well as Plaintiffs' retaliation claim and hostile work environment claims which directly relate to the alleged discriminatory incident would fall within the scope of Plaintiffs' administrative charges.

Accordingly, because the Court finds that Plaintiffs' Title VII claims of retalia-

tion for earlier complaints of discrimination and a hostile work environment prior to the September 19, 1999 event and of disparate treatment with respect to promotions, compensation and recognition, set forth in Counts 3, 6 and 9 of the federal complaint fail to satisfy a condition precedent to suit, these claims are dismissed from Counts 3, 6 and 9 of the complaint as unexhausted.

## II. Employment Discrimination Claims

Title VII of the Civil Rights Act of 1964 provides, in pertinent part:

It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.

42 U.S.C. § 2000e–2(a); *see James v. New York Racing Ass'n*, 233 F.3d 149, 153–55 (2d Cir.2000).

Section 1981 states in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to make and enforce contracts, ... and to the full and equal benefit of all the laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). In analyzing a § 1981

claim based on employment discrimination, courts employ the same standards as applied in Title VII.[12] *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir.2000).

The New York State employment discrimination laws are likewise analyzed under the same framework as governs Title VII and 1981 claims.[13] *See Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 & n. 1 (2d Cir.1999); *Van Zant v. K.L.M. Royal Dutch Airlines*, 80 F.3d 708, 714–15 & n. 6 (2d Cir.1996).

The Supreme Court has "established an allocation of the burden of production and an order for the presentation of proof on ... discriminatory treatment cases." *St. Mary's Honor Ctr.*, 509 U.S. at 506, 113 S.Ct. at 2746. Accordingly, under the pretext framework outlined in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) *and Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981),[14] first, a plaintiff must prove by a preponderance of the evidence a *prima facie* case of discrimination. *St. Mary's Honor Ctr.*, 509 U.S. at 506, 113 S.Ct. at 2746. If the plaintiff meets this burden, the burden shifts to the defendant, and the defendant must produce evidence that the adverse employment actions were taken "for some legitimate, nondiscriminatory reason." *Id.* at 509, 113 S.Ct. at 2742

12. Unlike Title VII, however, there is no requirement that plaintiff·exhaust administrative remedies prior to commencing a claim under § 1981. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 181, 109 S.Ct. 2363, 2375, 105 L.Ed.2d 132 (1981).

13. Unlike Title VII, however, there is no requirement that plaintiff exhaust administrative remedies prior to commencing a claim under the NYSHRL. *See* N.Y. Exec. L. § 297(9); *Crespo*, 2002 WL 398805, at *10.

14. The *McDonnell Douglas* burden shifting analysis which governs Title VII claims also applies to Plaintiffs' discrimination claims brought under Section 1981, *see Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987), and the NYSHRL, *see Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir.2000); *Brennan*, 192 F.3d at 317 n. 2; *see also Sogg v. American Airlines, Inc.*, 603 N.Y.S.2d 21, 23, 193 A.D.2d 153, 155–56 (1st Dep't 1993).

(quoting *Burdine*, 450 U.S. at 252–54, 101 S.Ct. at 1093–94); *see James*, 233 F.3d at 153–54.

Finally, if the defendant articulates a legitimate, nondiscriminatory reason for the employment actions, "the presumption raised by the prima facie case is rebutted, and drops from the case." *St. Mary's Honor Ctr.*, 509 U.S. at 507, 113 S.Ct. at 2747. The plaintiff then has the burden to prove by a preponderance of the evidence that the employer's stated reason was merely a pretext for discrimination. *See Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093; *James*, 233 F.3d at 156 ("[O]nce a minimal prima facie case is proved and the employer's nondiscriminatory explanation has been given, the *McDonnell Douglas* presumptions disappear from the case, and the governing standard is simply whether evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred."); *Lanzo v. City of New York*, 2000 WL 804628, at *6 (E.D.N.Y. May 18, 2000) ("The plaintiff must then show, without the benefit of any presumptions, that it is more likely than not that the employer's decision was motivated at least in part by a discriminatory reason. Because the defendant has at this point offered a nondiscriminatory reason for its actions, the plaintiff must show that the proffered reason is in reality a pretext for unlawful discrimination."). The Court must apply a case-by-case approach, "examining the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 167–68 (2d Cir.2001) (internal quotation marks and citation omitted).

Notwithstanding these shifting burdens, "[t]he ultimate burden of persuading the trier of fact that the defendant intentional-ly discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000) (quoting *Burdine*, 450 U.S. at 253–54, 101 S.Ct. 1089).

The Court will apply these principles to Plaintiffs' employment discrimination claims of (1) discriminatory discharge; (2) retaliation; (3) disparate treatment and (4) a hostile work environment.

**(1) Discriminatory Discharge**

■ In Counts 1, 2 and 4 of the complaint, Plaintiff Anderson alleges that Defendants terminated his employment on the basis of his race and color in violation of Title VII, § 1981 and the NYSHRL.

■ In order to establish a *prima facie* case of discriminatory discharge, Anderson must demonstrate that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *See Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 311–12 (2d Cir.1997) (citing *Burdine*, 450 U.S. at 253 & n. 6, 101 S.Ct. at 1094 n. 6); *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir.1994). The plaintiff's burden of demonstrating a *prima facie* case is *de minimus*. *See Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401 (2d Cir.1998). "In determining whether the plaintiff has met the *de minimus* initial burden of showing circumstances giving rise to an inference of discrimination, the function of the court on a summary judgment motion is to determine whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive. It is not the province of the summary judgment court itself to decide what inferences

should be drawn." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 204 (2d Cir.1995) (internal quotation marks and citation omitted).

### (a) First and Second Elements

There is no dispute that Anderson is a member of a protected class and that he was qualified for his position. Accordingly, to determine whether Anderson has proved a *prima facie* case, the real issues in dispute are whether he suffered an adverse employment action and whether he was treated differently than similarly-situated non-minority employees for the same or similar conduct. The record in this case demonstrates that Anderson has failed to allege facts sufficient to establish a *prima facie* case of unlawful discrimination.

### (b) Third Element

With respect to the third element, Anderson asserts that Home Depot's termination of his employment at the Valley Stream store and reinstatement to a part-time employment position at the Ozone Park store constituted adverse employment actions.

Under Title VII, an adverse employment action is actionable when it relates to an employee's "compensation, terms, conditions, or privileges of employment," or involves a classification which "[w]ould deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." 42 U.S.C. § 2000e–2(a); *see Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir.1999) ("Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand"). As the Second Circuit explained,

[a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.

*Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (internal quotation marks and citations omitted); *see Campbell v. Grayline Air Shuttle, Inc.,* 930 F.Supp. 794, 802 (E.D.N.Y.1996) (holding a material adverse change is one that "has an attendant negative result, a deprivation of a position or an opportunity") (internal quotation marks and citation omitted).

In an action such as this one, which involves a transfer upon reinstatement to employment, "the key inquiry is whether the transfer constitutes a negative employment action tantamount to a demotion. There must be a deprivation of opportunity or position." *Johnson v. Eastchester Union Free School Dist.,* 2002 WL 1684762, *3 (S.D.N.Y. July 23, 2002) (internal quotation marks and citation omitted). "Because there are no bright-line rules as to which employment actions meet the threshold for 'adverse,' courts must make this determination on a case-by-case basis." *Wilburn v. Fleet Fin. Group, Inc.,* 170 F.Supp.2d 219, 237 (D.Conn.2001) (quoting *Richardson v. New York State Dep't of Corr. Serv.,* 180 F.3d 426, 446 (2d Cir.1999)). "The key . . . is that the plaintiff must show that the [action] created a materially significant disadvantage." *Galabya,* 202 F.3d at 641 (internal quotation marks and citation omitted).

As an initial matter, Anderson's assertion that he suffered an adverse employment action when Home Depot discharged his employment at the Valley Stream store fails as a matter of law because at the conclusion of defendants' investigation into Anderson's allegations concerning the September 19, 1999 incident, defendants offered and Anderson accepted, an unconditional offer of reinstatement with full back pay, the same salary and benefits, and the same seniority status. Defendants investigation of plaintiffs' discrimination claims rendered Anderson's termination a mediate action that was ultimately reversed by Anderson's reinstatement. *Cf. Almonte v. Coca–Cola Bottling Co.,* 959 F.Supp. 569, 572–73 (D.Conn.1997).

Additionally, Home Depot removed all references to Anderson's temporary termination from Company records. Inasmuch as Anderson "suffered no loss of wages, benefits, responsibilities, or anything else," his temporary termination resulted in no legally cognizable adverse effect on his employment. *Islamic Society of Fire Dep't Personnel v. City of New York,* 205 F.Supp.2d 75, 84 (E.D.N.Y.2002); *see Ticali v. Roman Catholic Diocese of Brooklyn,* 41 F.Supp.2d 249, 264–65 (E.D.N.Y.) (holding plaintiff could not rely on her termination to satisfy the adverse employment action element of her *prima facie* case where her termination was retracted), *aff'd* 201 F.3d 432 (2d Cir.1999); *Wilson v. Consolidated Edison Co.,* 2000 WL 335733, at \*8 n. 14 (S.D.N.Y. Mar.30, 2000) (holding reinstatement negates any adverse employment action); *Almonte,* 959 F.Supp. at 572–73 (finding no adverse employment action where following arbitration, employer reinstated employee with full back pay and seniority); *see also Wanamaker v. Columbian Rope Co.,* 907 F.Supp. 522, 534 (N.D.N.Y.1995) (finding no adverse employment action where employer terminated employee but continued to give employee full salary and benefits because employee "did not lose any pay or other tangible benefits"), *aff'd* 108 F.3d 462; *cf. Washington v. County of Rockland,* 211 F.Supp.2d 507, 513–14 (S.D.N.Y. 2002) (finding no adverse employment action where disciplinary charges against plaintiffs were dismissed after hearings, any loss of pay was reinstated and no further disciplinary actions were taken).

■ Next, Anderson's contention that he has suffered a change in working conditions at the Ozone Park store sufficiently disruptive to be materially adverse is belied by the record. Anderson does not contest the location of the transfer to Ozone Park. Rather, he argues that since being recalled to the Ozone Park store, (i) his employment hours have been reduced from full-time hours to part-time hours and (ii) he has been assigned a new position as a shopping cart pusher, which is a different position with different duties than the position he held as an order puller at the Valley Stream store.

Contrary to Anderson's argument, the record indicates that throughout Anderson's tenure at the Valley Stream store, Anderson was a part-time, hourly employee who did not work a fixed number of hours each week, and whose schedule varied greatly from week to week. *See* Deluca Reply Aff., Exh. B (Analysis of Anderson's Weekly Work Hours at Home Depot's Valley Stream store indicates the number of hours worked varied from 11.25 hours to 36.25 hours per week; during his last week at the Valley Stream store, Anderson worked 16.75 hours). There is no evidence that had Anderson continued to work in the Valley Stream store, he would have worked any more hours than he worked in the Ozone Park store.

In addition, the record is clear that Anderson suffered no diminution in wages,

employment benefits or seniority status. *See Islamic Society of Fire Dep't Personnel*, 205 F.Supp.2d at 84 ("Typically, adverse employment actions are economic injuries such as dismissal, suspension, failure to promote, or diminution in pay") (internal quotation marks and citation omitted).

Finally, other than his conclusory statement that the Ozone Park position was a "different job with different duties," (Pls. Memorandum of Law in Opposition at 19), Anderson has not proffered any evidence that a rational factfinder could infer that his position as a shopping cart pusher constituted a demotion from his position as an order puller. *See Galabya*, 202 F.3d at 641 (a lateral transfer does not constitute a materially adverse job action unless it "results in a change in responsibilities so significant as to constitute a setback in plaintiff's career"); *Weeks*, 273 F.3d at 86; *see also Pimentel v. City of New York*, 2002 WL 977535, *4 (S.D.N.Y. May 14, 2002) ("the mere fact than an employee has been transferred or that his job responsibilities have changed is not in itself sufficient to show an adverse change in working conditions") (internal quotation marks and citation omitted); *Ticali*, 41 F.Supp.2d at 264 (same).

In summary, viewing the evidence in the light most favorable to Anderson, the Court finds that Anderson failed to establish that the termination of his employment and reinstatement to a lateral position constituted a materially adverse change in the terms and conditions of his employment.

### (c) Fourth Element

■ Notwithstanding the above, the only remaining question regarding Anderson's *prima facie* case is whether the circumstances of his termination and/or reinstatement give rise to an inference of discrimination.

■ In determining whether Plaintiff has supported such an inference, the proper inquiry is "[w]hether the evidence can reasonably and logically give rise to an inference of discrimination under all of the circumstances." *Bickerstaff v. Vassar College*, 196 F.3d 435, 448 (2d Cir.1999). This "may be proven by showing that a similarly situated individual not in [plaintiff's] protected group . . . was treated differently." *Tramble v. Columbia Univ.*, 1999 WL 61826, at *5 (S.D.N.Y. Feb.10, 1999); *see also Hargett v. National Westminster Bank*, 78 F.3d 836, 839 (2d Cir.1996). "Although the ultimate burden in making a prima facie case is slight, the issue of whether fellow employees are similarly situated is somewhat strict." *Brown v. Middaugh*, 41 F.Supp.2d 172, 184 (N.D.N.Y. 1999).

■ "To be similarly situated, the individual with whom [a plaintiff] attempts to compare [himself] must be similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir.1997); *see Francis v. Runyon*, 928 F.Supp. 195, 203 (E.D.N.Y.1996) ("[e]mployees are not 'similarly situated' merely because their conduct might be analogized. Rather, in order to be similarly situated, other employees must have reported to the same supervisor as the plaintiff, must have been subject to the same standards governing performance, evaluation and discipline, and must have engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it.").

With respect to Anderson's wrongful discharge claim, an examination of all of the circumstances surrounding his termination and the other evidence in this case does not yield an inference of racial discrimination as an element in Anderson's

discharge. Anderson has not submitted any evidence to suggest that similarly situated non-minority employees were treated any more favorably than Anderson. *See Rochester v. Blue Cross & Blue Shield,* 2000 WL 1052064, at *6 (E.D.N.Y. June 27, 2000). To the contrary, there is evidence in the record that Home Depot's stated reasons for terminating Anderson, namely a safety violation and insubordination, were also the stated reasons given for the termination of certain other white employees, two of whom were terminated within four days of Anderson's termination for insubordination and for a safety violation respectively. *See* DeLuca Aff., Exh. A; *see also Francis v. Chemical Banking Corp.,* 62 F.Supp.2d 948, 957–58 (E.D.N.Y. 1999), *aff'd* 213 F.3d 626.

Assuming as the Court must for purposes of this motion that Anderson's account of the September 19, 1999 incident is accurate, it goes without saying that Department Head Duffy's conduct was improper, his verbal use of the racial epithet, "worthless nigger" was reprehensible and Anderson's termination may have been unwarranted. However, as discussed *supra,* the record indicates that Defendants conducted an investigation into the incident, addressed Duffy regarding his conduct and upon the conclusion of the investigation, reinstated Anderson with full back pay and benefits. Under such circumstances, the evidence fails to give rise to a reasonable inference of race discrimination in connection with Anderson's discharge. *See, e.g., Stembridge v. City of New York,* 88 F.Supp.2d 276, 285–86 (S.D.N.Y.2000) (African–American employee's suspension without pay resulting from an altercation with his supervisor did not occur in circumstances giving rise to inference of discrimination where employer scheduled disciplinary hearing to address employee's allegations but plaintiff chose not to participate in the process).

With respect to Anderson's transfer upon reinstatement. Anderson has not presented any evidence that this alleged employment action was racially motivated. Anderson has not alleged that he was subjected to racially derogatory comments in connection with the transfer nor has he proffered any other evidence of racial animus in this regard. Under such circumstances, the evidence does not support a reasonable inference of discrimination as it relates to his reinstatement. *See Ticali,* 41 F.Supp.2d at 264–65.

Hence, because Anderson cannot show that he has suffered an adverse employment action that was a product of discriminatory animus, this Court finds that Plaintiffs have failed to establish a *prima facie* case of discriminatory discharge. Accordingly, the Court grants summary judgment in favor of Defendants on the discriminatory discharge claim brought under Title VII, § 1981 and the NYSHRL [15] and dismisses Counts 1, 2 and 4 of the complaint.

### (2) Retaliation

In Counts 3 and 5 of the complaint, Plaintiffs allege that Defendants terminat-

---

**15.** Plaintiffs' inability to demonstrate a *prima facie* case of discriminatory discharge under Title VII is equally fatal to their claims under § 1981, *see St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993); *Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000), and under state law, *see Torres v. Pisano,* 116 F.3d 625, 629 n. 1 (2d Cir.1997) ("We have frequently noted that claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII."); *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714–16 & n. 6 (2d Cir.1996) (same); *see also Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177 (2d Cir.1996) ("New York courts rely on federal law when determining claims under New York Human Rights Law"); *Ticali,* 41 F.Supp.2d at 267–68.

ed Anderson's employment in retaliation for his complaints of discrimination in violation of Title VII and the NYSHRL.

■ Section 704(a) of the Civil Rights Act of 1964 provides that

"[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter."

42 U.S.C. § 2000e–3(a). Thus, Title VII prohibits retaliatory adverse employment actions against an employee who opposes alleged discriminatory practices. *See Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 291–92 (2d Cir. 1998) ("The objective of this section is obviously to forbid an employer from retaliating against an employee because of the latter's opposition to an unlawful employment practice"); *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1038 (2d Cir. 1993).

The Second Circuit has instructed courts to analyze Title VII retaliation claims under the framework established in *McDonnell Douglas Corp.*, 411 U.S. at 802–05, 93 S.Ct. at 1824–26 and *Burdine*, 450 U.S. at 252–56, 101 S.Ct. at 1093.[16] *See Cosgrove*, 9 F.3d at 1038; *see also McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir.2001). Under this analysis, a plaintiff establishes a prima facie case of retaliation by showing: (1) participation in a protected activity known to the defendant; (2) an employment action adverse to the plaintiff and (3) a causal connection between the protected activity and the adverse employment action. *See Torres*, 116 F.3d at 639. The causal connection element of this test may be met by a proffer of either direct or circumstantial evidence. *See Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

■ In Plaintiffs' Opposition Memorandum and Affidavit, Anderson alleges for the first time that he engaged in protected activity when he complained to Gervasi and Clougher about his confrontation with Duffy on September 19, 1999 and Duffy's use of the racial epithet, "worthless niggers." According to Anderson, Gervasi went to the store manager Camacho to seek permission to terminate Anderson based on this complaint and defendants retaliated against Anderson by terminating his employment shortly thereafter. (Pls. Memorandum of Law in Opposition, at 21–22; Anderson Aff. ¶ 3). A review of the record, however, indicates that this allegation is at odds with both Anderson's deposition testimony and Anderson's Rule 56.1 Statement submitted to this Court in opposition to Defendants' summary judgment motion. *Compare with* Slavin Aff., Exh. C at 109–11 *and* Pl. Anderson's 56.1 Statement at ¶¶ 37, 39.

In both his deposition testimony and Rule 56.1 Statement. Anderson maintains that Gervasi did not allow him to speak and would only listen to Duffy's version of the incident. For example, in his deposition testimony, Anderson stated:

.... We are coming back through the lumber aisle. That is when I see Jim Duffy talking to John Clougher.

So I stopped the forklift, and I get off the forklift, and I go over there. And me and Lumhoo, that is when Jim Duffy is talking to John Clougher, talking about me. [sic] Talking about how I cursed him out and how I was fucking his lumber and stuff like that.

---

**16.** Under both Title VII and the NYSHRL, the *McDonnell Douglas* burden shifting analysis governs retaliation claims. *See, e.g., Reed*, 95 F.3d at 1177 (Title VII); *Torres*, 116 F.3d at 629 n. 1.

I was trying to talk. Tell him about what you said to us, and all the shit that you just talking. [sic] That is when Joe Gervasi walked over there. Now Jim Duffy talking. [sic] Joe Gervasi told me not to say nothing and let Jim talk.

Now Jim Duffy is talking. When he finished talking, I was about to say something. [sic] That is when Joe Gervasi hopped in my face and said—put his finger in my face, on my nose, and was like—he was, You don't fucking talk. Whatever he says goes. He is your fucking manager. When he says jump, you fucking jump, or whatever, like that.

So that is when I was like—I am saying, you ain't even hear what I have to say. [sic] Joe Gervasi say, It don't matter what you say. You don't mean nothing here. He is your supervisor. Whatever he say, goes.

I was like, All right. After, we kept doing deliveries.

About 15 minutes later, over the page system it said, Jemel, come to the back office. So I go back there. And it was John Clougher and Jim Gervasi in there. . . . And they said they had just finished talking to Jose Camacho on the telephone, or whatever, like that, and they said, I'm being terminated for not having a seat belt on. . . .

So you know I'm beefing. I'm like, Why I'm being terminated? Let me talk to Jose Camacho, tell him the real story, because John didn't let me talk.

We can't let you talk to him. He is at his house. Now we got to escort you out of the store.

(Slavin Aff., Exh. C at 109–111).

Likewise, in his 56.1 Statement, Anderson states, "Mr. Camacho was never informed of Plaintiff Anderson's version, as Mr. Gervasi refused to question or listen to Plaintiff Anderson," *see* Pl. Anderson's 56.1 Statement at ¶ 37, and "Mr. Camacho spoke to Mr. Gervasi about the September 19, 1999 incident to the extent that he understood the situation." Since Mr. Gervasi never questioned Plaintiff Anderson, Mr. Camacho never knew that he did not know both sides of the situation, *see* Pl. Anderson's 56.1 Statement at ¶ 38.[17]

Thus, because the present affidavit and opposition memorandum unambiguously contradict Anderson's previous sworn testimony, the Court declines to credit Anderson's self-serving statements in his opposition papers or consider the new allegations therein to find a material issue of fact as to whether Home Depot's Manager Camacho (or Assistant Manager Gervasi) had the requisite knowledge of Anderson's objection to Duffy's use of a racial epithet when Camacho authorized Anderson's termination. *Compare Bickerstaff v. Vassar College*, 196 F.3d 435, 455 (2d Cir.1999) ("It is beyond cavil that a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that . . . contradicts the affiant's previous deposition testimony.") (internal quotation marks and citation omitted), *and Trans–Orient Marine Corp. v. Star Trading & Marine*, 925 F.2d 566, 572 (2d Cir.1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony."), *with Palazzo v. Corio*, 232 F.3d 38, 43–44 (2d

---

**17.** Additionally, the Court notes that at Nichols deposition, she testified that when Plaintiffs complained to her about the September 19, 1999 event, they told her that they were not permitted to give their side of the story and that only Duffy was allowed to speak. (Slavin Aff., Exh. E at 40.)

Cir.2000) (holding principle that party who has testified to a given fact in deposition cannot create triable issue on summary judgment by submitting affidavit denying fact "does not apply if the deposition and the later sworn statement are not actually contradictory ... [or] where the later sworn assertion addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition ... [or] where the testimony is contradicted by evidence other than the deponent's subsequent affidavit"), *and Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106, 112–13 (holding "[i]f there is a plausible explanation for discrepancies in a party's testimony, the court considering a summary judgment motion should not disregard the later testimony because of an earlier account that was ambiguous, confusing, or simply incomplete"), *as amended by* 169 F.3d 782 (2d Cir.1998).

Moreover, while filing administrative charges with the EEOC is clearly a protected activity, in the instant matter, Plaintiffs' filings did not occur until after the allegedly improper conduct occurred. *See Bliss v. Rochester City School Dist.,* 196 F.Supp.2d 314 (W.D.N.Y.2002) (plaintiffs failed to establish prima facie case of retaliation under Title VII, where protected activity of filing charge with EEOC occurred after employer's alleged retaliation); *Seils v. Rochester City School Dist.,*

192 F.Supp.2d 100, 119 (W.D.N.Y.2002) (same).

Finally, as discussed previously, Plaintiffs have failed to allege an adverse employment action sufficient to a make out a prima facie case of retaliation.[18]

Viewing all admissible evidence in the light most favorable to Plaintiffs, the Court finds that the evidence fails to raise a genuine issue of material fact regarding whether Anderson's termination was a result of his participation in a protected activity. Hence, the Court grants Defendants' motion for summary judgment on the retaliation claims under Title VII and the NYSHRL [19] and dismisses Counts 3 and 5 of the complaint.

### (3) Disparate Treatment

In Counts 6, 7 and 8 of the complaint, Plaintiffs allege that Defendants violated Title VII, § 1981 and the NYSHRL by failing to provide Plaintiffs with the same benefits, terms and conditions of employment as those afforded to similarly situated Caucasion employees, including promotions, compensation, disciplinary measures and recognition, on the basis of Plaintiffs' race and color.[20]

 Title VII prohibits employment discrimination resulting from practices that are facially neutral but have a disparate impact "because they fall more

---

**18.** *See supra* at 138–140 (discussion regarding the third element of the discriminatory discharge).

**19.** Plaintiffs' inability to demonstrate a *prima facie* case of retaliation under Title VII is equally fatal to their retaliation claims under state law. *See Torres,* 116 F.3d at 629 n. 1; *Van Zant,* 80 F.3d at 714–16 & n. 6; *see also Reed,* 95 F.3d at 1177; *Ticali,* 41 F.Supp.2d at 267–68.

**20.** The standard for liability in a disparate treatment action pursuant to § 1981 and the

NYSHRL is the same as under Title VII. *See Torres,* 116 F.3d at 629 n. 1; *Reed,* 95 F.3d at 1177; *Martin v. Citibank, N.A.,* 762 F.2d 212, 216–17 (2d Cir.1985); *see also Ghose v. Century 21, Inc.,* 12 Fed.Appx. 52, 55 (2d Cir. June 14, 2001) (affirming dismissal of disparate treatment claim under NYC law because "analysis of [plaintiff's] federal Title VII claim disposes of his parallel New York State and New York City claims"); *Shannon v. Fireman's Fund Ins. Co.,* 156 F.Supp.2d 279, 287 n. 6, 291–94 (S.D.N.Y.2001).

harshly on a protected group than on other groups and cannot otherwise be justified." *Waisome v. Port Authority of N.Y. and N.J.*, 948 F.2d 1370, 1374 (2d Cir.1991). In order to establish a *prima facie* case of disparate treatment, a plaintiff "must show that a facially neutral employment policy or practice has a significant disparate impact." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir.1998) (internal quotation marks and citation omitted); *see Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989) ("a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack"); *Waisome*, 948 F.2d at 1375 (plaintiff must "identify the specific employment practice he is alleging and then show that practice excluded him or her, as a member of a protected group, from a job or promotion opportunity"). "Allegations which contend only that there is a bottom line racial imbalance in the workforce are insufficient." *Brown*, 163 F.3d at 712 (citation omitted).

As a preliminary matter, as set forth previously, with the exception of Plaintiffs' allegations of disparate treatment with respect to disciplinary measures in connection with the September 19, 1999 incident, Plaintiffs' causes of action based upon disparate treatment under Title VII are barred because of the failure to exhaust administrative remedies. Notwithstanding, even on the merits, Plaintiffs' claims of disparate treatment with respect to promotions, compensation, recognition and disciplinary measures prior to the September 19, 1999 event must be dismissed because Plaintiffs fail to establish a *prima facie* case of disparate treatment.

### (a) Promotions

■ Plaintiffs contend that Defendants failed to provide them with the same employment opportunities with regard to promotions and training opportunities afforded to similarly situated white employees. According to Plaintiffs, Defendants "disproportionately recruited and/or promoted Caucasion employees to the upper level management ranks despite the fact that African–American employees comprise[d] approximately 50–75% of the workforce at the store." Compl. ¶ 30.

■ "In order to establish a *prima facie* case for failure to promote, the plaintiff must allege that: 1)[he] is a member of a protected class; 2)[his] job performance was satisfactory; 3)[he] applied for and was denied promotion to a position for which he was qualified; and 4) the position remained open and the employer continued to seek applicants." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir.2000); *Simmons v. New York City Health & Hosp. Corp.*, 2001 WL 483675, at *6 (E.D.N.Y. Mar.30, 2001).

Here, Plaintiffs fail to allege that they ever applied for any specific position for which they were rejected. Rather, Plaintiffs allege generally that they were denied promotions and training opportunities. Such general allegations are insufficient to prove a failure to promote claim. *See Brown*, 163 F.3d at 710 ("We read *McDonnell Douglas* and *Burdine* generally to require a plaintiff to allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion."); *Ralkin v. New York City Transit Auth.*, 62 F.Supp.2d 989, 993 n. 5 (E.D.N.Y.1999) ("Because plaintiff concedes that she was not eligible for and in fact sought no promotions during her employment at the NYCTA, the complaint fails to allege a *prima facie* claim of employment discrimination based on defen-

dant's alleged discriminatory failure to promote plaintiff"). "Unlike other conditions and privileges of employment, a promotion is not something to which every employee is automatically entitled as a matter of course ... [an employee] does not automatically become entitled to be promoted by virtue of ... seniority." *Davis v. Bowes,* 1997 WL 655935, at *19 (S.D.N.Y. Oct.20, 1997), *aff'd* 159 F.3d 1346 (2d Cir.1998).

Plaintiffs assert nonetheless that the general mandate requiring them to allege that they had applied for a particular position and were rejected does not apply because (1) defendants required employees interested in a promotion to attend Department Supervisor Training ("DST") and minorities were not permitted to attend those classes; and (2) defendants required employees seeking advancement to register for jobs in which they were interested as part of the computerized Job Preference Process ("JPP") and the JPP computer was often unplugged or not functioning.[21] (Pl. Anderson's 56.1 Statement at ¶¶ 8–11; Pl. Lumhoo's 56.1 Statement at ¶¶ 12–14). Plaintiffs' assertions are unpersuasive.

As to the first assertion, the record indicates that the only prerequisite for accessing the JPP system to apply for a promotion is employment with Home Depot, and there is no evidence in the record that attending a DST class was a prerequisite to an employee's eligibility for a promotion. (Morway Aff., Exh. D). Moreover, the record shows that during the period of Plaintiffs' tenure in the Valley Stream store, two-thirds of all promotions into management went to minorities, de-

spite Plaintiffs' contention that minorities were not permitted to attend DST. (DeLuca Aff., Exh. B, indicating that of the twelve Home Depot employees promoted to Department Supervisor at the Valley Stream store between January and December 1999, 4 employees were white, 7 employees were black and one employee was hispanic). As to the second assertion, the record indicates that during Plaintiffs' tenure at the Valley Stream store, 99 employees, including 73 minorities, applied for promotions using the JPP computer. (DeLuca Reply Aff., Exh. C, indicating that between May 15, 1999 and October 11, 1999 in the Valley Stream store, 66 black employees accessed the JPP system, 26 white employees accessed the system, 4 hispanic employees accessed the system and 3 asian/pacific isle employees accessed the system).

Moreover, because Plaintiffs do not compare themselves to similarly-situated non-minority employees, their bald assertions that (1) defendants "disproportionately recruited and/or promoted Caucasion employees to the upper level management ranks despite the fact that African–American employees comprise approximately 50–75% of the workforce at the store," Compl. ¶ 30, and (2) defendants promoted white employees disproportionately over blacks because "the majority of the department heads [supervisors] are white ... the majority of the assistant managers are white ... [and] there is virtually very few blacks in the DST class," Lumhoo Dep. at 201, fail to bolster Plaintiffs' failure to promote claims or give rise to an inference that defendants' promotion policies had a dispa-

---

**21.** The JPP is the avenue for employees to inform store management about their job interests and preferences and is open to all employees seeking advancement. (Morway Aff., Exh. D at 60–61). In order to receive a promotion, an employee is required to regis- ter for the job position in which that employee is interested or register that employees' job interests and preferences by using the computerized JPP located in the store's break room or through Interactive Voice Response by calling 1–877–225–4JPP. *(Id.)*

rate impact. *See Lawson v. Getty Terminals Corp.*, 866 F.Supp. 793, 802–03 (S.D.N.Y.1994); *Bitter v. Chase Manhattan Bank*, 1983 WL 610, at *6 (S.D.N.Y. Dec.7, 1983) ("plaintiff's statistical evidence does not bolster his promotion discrimination claim because plaintiff does not compare himself to individuals who have his education, experience or job level").

■ Finally, Plaintiffs' claim that whites were disproportionately promoted over blacks based on another non-management employee's belief[22] is insufficient to create a genuine issue of material fact. "Allegations of disparate treatment made without personal knowledge and unsupported by admissible evidence do not satisfy even the minimal burden which a plaintiff faces at the *prima facie* stage of proceedings." *Wang v. N.Y.C. Dep't of Finance*, 1999 WL 529550 *14 (E.D.N.Y. July 21, 1999), *aff'd* 216 F.3d 1074 (2d Cir.2000)

### (b) Compensation

■ Plaintiffs also claim that their compensation, including their salaries, raises and/or bonuses, was not equal to similarly situated non-minority employees.

■ To establish a *prima facie* compensation discrimination claim, plaintiffs must show: (1) that they are members of a protected class; (2) they were paid less or otherwise treated disparately than similarly situated non-members of their protected class; and (3) evidence of a discriminatory animus. *See Belfi v. Prendergast*, 191

F.3d 129, 139 (2d Cir.1999); *Cruse v. G & J USA Publ'g*, 96 F.Supp.2d 320, 326 (S.D.N.Y.2000). Plaintiffs fail to satisfy prong two and three of the *prima facie* test.

### (i) Salaries

First, Plaintiffs fail to show that they were treated disparately in pay from similarly situated Caucasian co-workers. Indeed, neither Plaintiff could identify by name a single similarly situated employee who was paid more or treated differently. The record indicates that during Lumhoo's deposition, he stated that he had no knowledge of what others were paid. (Morway Aff., Exh. B at 24–25). In addition, when asked in an interrogatory to identify the higher paid Causcasion employee who was unidentified in the Complaint, Plaintiffs stated they were "the Caucasian employees at the Valley Stream store whose full names and identities are not known to Plaintiffs." (Morway Aff., Exh. O at 3–4).

Next, Plaintiffs' claim that a program of pay adjustments instituted in the Valley Stream store is proof of disparate pay is unavailing because the record indicates (i) the adjustment program commenced prior to either Plaintiffs' employment at the Valley Stream store and did not affect Plaintiffs; (ii) during the relevant period, Lumhoo was the third highest paid of the eight drivers employed at the Valley Stream store;[23] and (iii) the administrative store manager Nichols, who set Plaintiffs' salaries and completed the adjustment pro-

---

**22.** Plaintiffs claim that Jean Dadaille, an African–American male, told them that whites were promoted over blacks. (Anderson Dep. at 212; Lumhoo Dep. at 169). When questioned at his deposition, Dadaille stated that his belief came from seeing "white associates get hired and promoted over black associates that had been there several years." (Morway Aff., Exh. N, Dadaille Dep. at 120). Notably,

Dadaille testified that he was asked to be part of management in the Valley Stream store, but had declined to do so. (Morway Aff., Exh. N, Dadaille Dep. at 70).

**23.** Of the highest paid drivers, one was African–American, one was Caucasian and each had been employed at least seven years longer than Lumhoo. (DeLuca Reply Aff. ¶ 7).

gram testified that the disparity was not limited to minority employees and that certain African–Americans were highly paid, (Morway Aff., Exh. E at 112).

Finally, Plaintiffs' reliance on the testimony of co-worker Dadaille to prove that white employees were paid more than minority employees is misplaced. Dadaille was unable to identify any white employee similarly situated to Plaintiffs who were paid more, and when questioned, Dadaille testified that his knowledge of the alleged disparity came from conversations with other employees, but was unable to proffer any specifics with regard to this knowledge. (Morway Aff., Exh. N at 57, 117–19). Additionally, Dadaille stated that he had no personal knowledge of any employee's pay other than his own. (Morway Aff., Exh. N at 128). *See Wang.* 1999 WL 529550, at *14.

Assuming *arguendo*, that Plaintiffs could establish a discriminatory pay disparity, Plaintiffs have produced no evidence of circumstances giving rise to an inference of defendants' discriminatory animus other than the conclusory allegations that Plaintiffs were treated differently because of their race and color. Such statements are insufficient as a matter of law to raise an issue of fact. *See Bickerstaff,* 196 F.3d at 452 (holding statements that are replete with conclusions but devoid of specifics are insufficient to defeat summary judgment); *see also Gross v. National Broadcasting Co.,* 2002 WL 1482621, at *11 (S.D.N.Y. July 10, 2002) (holding that conclusory statements and subjective beliefs that Plaintiff was treated differently because of her gender cannot withstand a properly

supported summary judgment motion); *Augustus v. Metro Channels, L.L.C.,* 2002 WL 1033141, at *9 (S.D.N.Y. May 15, 2002).

**(ii) Raises**

█ Plaintiffs' claim of discrimination with regard to pay raises on the basis of their race and color is not supported by the record.

Under Home Depot's Company policy, employees are not eligible for a raise until they have been employed with the Company for one year. (Morway Aff., Exh. D at 70). At the time Plaintiffs left the Valley Stream store, Anderson had been employed for five months and Lumhoo for seven months. Notably, neither Plaintiff alleges that he requested a raise or could identify a similarly situated non-minority employee who received a raise despite the Company policy.[24] Inasmuch as Plaintiffs were not eligible for a raise because of their short period of employment, Plaintiffs cannot establish an adverse employment action nor can they establish that a disparity occurred under circumstances giving rise to an inference of discrimination. *See Chastven v. Cigna Corp.,* 1999 WL 1034753, at *11 (S.D.N.Y. Nov.12, 1999) (holding employer's failure to give additional compensation to employee was not an adverse employment action because employee was not eligible to receive such compensation under Company's policy).

**(iii) Bonuses**

Plaintiff's claim that they were denied longevity bonuses based on their race and color is equally unavailing.

---

**24.** Plaintiffs' argument that a disparity exists because Caucasians with less experience had advised co-worker Dadaille that they received a higher raise than he is flawed because the allegation of disparate treatment is not made with personal knowledge or supported by admissible evidence, *see Wang,* 1999 WL 529550, at *14, and Plaintiffs fail to compare themselves to similarly situated Caucasians, *see Bitter,* 1983 WL 610, at *7; *see also Lapsley v. Columbia Univ.-College of Physicians & Surgeons,* 999 F.Supp. 506, 517 (S.D.N.Y. 1998).

It is undisputed that under Home Depot Company Policy, hourly employees were eligible to receive a longevity bonus after two or more years of employment. (Pl. Anderson's 56.1 Statement at ¶ 5; Pl. Lumhoo's 56.1 Statement at ¶ 10). Given that neither Plaintiff had been employed for the requisite period of time when they left the Valley Stream store, and neither Plaintiff has identified any similarly situated minority employee who was given a longevity bonus despite the Company policy, Plaintiffs' claim that Defendants' failure to give them a bonus constituted an adverse employment action made under circumstances giving rise to a discriminatory animus is untenable. *See Lapsley*, 999 F.Supp. at 519.

In short, because Plaintiffs have failed to identify a single similarly situated employee who was paid more in salary, raises and/or bonuses than they, and Plaintiffs have failed to direct the Court to any statements, actions or any other circumstances that raise a specter of discriminatory animus, Plaintiffs have failed to establish a discriminatory compensation disparity claim.

### (c) Recognition

Plaintiffs' claim that Defendants treated them in a disparate manner from their white colleagues by refusing to give minority employees recognition and merit awards fails because Plaintiffs do not adequately establish an adverse employment action or allege a causal connection between any facially neutral Company policy and a resultant disparate impact on minority employees.

First, while Plaintiffs concede that the failure to receive recognition and merit awards is insufficient to adversely effect the terms and conditions of their employment at the Valley Stream store, *see Plaintiffs' Memorandum of Law in Opposition* at 29, Plaintiffs argue that "in the context of all of the disparate treatment of minority employees as compared with Caucasian employees, the refusal to give minority employees recognition and merit awards aided in the materially adverse change of the terms and conditions ... and negatively impacted minorities in the areas of compensation and promotions," *id.*

Plaintiffs attempt to bootstrap their recognition claim to an overall disparate impact claim regarding compensation and promotions is undercut by the fact that as discussed above, Plaintiffs have failed to establish a *prima facie* case of disparate treatment with respect to those terms and conditions of employment. Moreover, assuming *arguendo* that Plaintiffs could establish that the failure to grant minorities recognition and merit awards constituted an adverse employment action, Plaintiffs have failed to identify any similarly situated white employee who received preferential treatment despite the Company policy. In response to Defendants' interrogatory asking Plaintiffs to name all Caucasians who received more favorable treatment, Plaintiffs responded, "[t]he similarly situated Caucasian employees referred in paragraph 29 of the Complaint are the Caucasian employees at the Home Depot's Valley Stream store. The full names and/or identities are not known to Plaintiffs but are or should be contained in the records of The Home Depot." (Morway Aff., Exh. D at 22). Such generalities, absent any concrete particulars, are insufficient to defeat a summary judgment motion. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997); *Little v. New York*, 1998 WL 306545, at *6 (E.D.N.Y. June 8, 1998), *aff'd* 173 F.3d 845 (2d Cir. 1999); *see also Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985); *Adeniji v. Administration for Children Servs.*, 43 F.Supp.2d

407, 423 (S.D.N.Y.), *aff'd* 201 F.3d 430 (2d Cir.1999).

Finally, Nichols, who is both African–American and responsible for deciding which employees received a merit award during the relevant time, testified that in the departments that she managed, which included both Plaintiffs, more minorities received merit awards that white employees. (Morway Aff., Exh. E at 186).

#### (d) Disciplinary Measures

■ Plaintiffs' final disparate treatment claim is that Defendants subjected them to more frequent or harsher disciplinary actions on the basis of their race and color. Specifically, Plaintiffs contend that they were "written up" for disciplinary infractions while non-minority employees did not receive such a notice under similar circumstances. According to Plaintiffs, receiving a disciplinary notice is an adverse employment action because (1) after an employee receives three write up for the same reasons, termination is automatic, and (2) write ups are part of the employment file and are considered in connection with raises, bonuses and promotions. Plaintiffs claim is without merit.

■ Disciplinary notices, "threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *Honey v. County of Rockland*, 200 F.Supp.2d 311, 320 (S.D.N.Y.2002); *see Weeks v. New York*, 273 F.3d 76, 86 (2d Cir.2001) (finding notice of discipline for misconduct did not constitute adverse employment action for purposes of employee's Title VII claim of disparate treatment where employee alleged no facts which could support inference that the notice created a materially adverse change in her working conditions); *Shabat v. Blue Cross Blue Shield*, 925

F.Supp. 977, 989 (W.D.N.Y.1996) (finding no adverse employment action where the alleged discipline consisted of being "written-up" and employee never "demoted or denied pay or other benefits as a result of these reports"), *aff'd* 108 F.3d 1370 (2d Cir.1997); *Carter v. N.Y.C. Dep't of Corrections*, 7 Fed.Appx. 99, 103–04 (2d Cir. April 5, 001); *see also Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 248 (S.D.N.Y.2001); *Ericson v. City of Meriden*, 205 F.R.D. 75, 77 (D.Conn.2001).

Here, Plaintiffs have failed to show how the disciplinary notices affected their compensation or any other benefits of their employment. For example, Lumhoo alleges that he was written up for working unauthorized overtime and leaving the door of a truck unlocked overnight. According to Lumhoo, Clougher and Danny "Q" told Lumhoo that he was the only person being written up because he was being used as an example. (Pl. Lumhoo's 56.1 Statement ¶¶ 7(a), 25). Significantly, Lumhoo was not written up for unauthorized overtime until he transferred to the Ozone Park store in October 1999, (DeLuca Reply Aff. ¶ 6), which is after the relevant time period of this action and is therefore not before the Court. With respect to the notice for leaving the truck unlocked, Lumhoo does not allege nor is there anything in the record that indicates this notice was accompanied by an adverse consequence.

Thus, the Company's alleged warning that repeated future misconduct would result in termination and the Company's placement of a disciplinary notice in Plaintiffs' file without any other materially adverse consequence fail to constitute actionable harm. *See Stembridge v. City of New York*, 88 F.Supp.2d 276, 283 (S.D.N.Y. 2000) (finding no actionable harm where "reprimand contained a warning that repetition of improper behavior could result in

disciplinary action but contained no indication of any planned discipline or further action."); *Slinkosky v. Buffalo Sewer Auth.,* 2000 WL 914118, at *8 (W.D.N.Y. June 29, 2000) (finding no actionable harm by employer's failure to remove reprimand letter from employee's file because Plaintiff did not show that letter affected her salary or other terms, privileges or conditions of her employment).

Moreover, Plaintiffs have failed to identify any similarly situated Caucasian employee who engaged in the same misconduct and was not written up. Plaintiffs' proof of disparate discipline consists of unsupported conclusory allegations and inadmissible hearsay. For example, Lumhoo alleges that Anderson clocked out early on a Saturday without permission and was written up, while an unidentified Caucasian sales associate in the lumber department who worked a different shift than he told Lumhoo that he had clocked out early without authorization and was not written up. (Slavin Aff., Exh. B at 137–143). Notably, even if Lumhoo had identified the white employee, neither Lumhoo, who was in the delivery department, nor Anderson, who was a puller, had the same supervisor as the unidentified white employee in lumber and therefore the employee could not be held to be similarly situated to Plaintiffs. *See Bennett,* 136 F.Supp.2d at 249–50 (an employee similarly situated to Plaintiff must have "reported to the same supervisor as the Plaintiff, must have been subject to the same standards governing performance evaluation and discipline and must have engaged in conduct similar to the Plaintiff's without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it").

▊ Further, Lumhoo alleges that a Caucasion driver, Bill, told him that he twice refused to do his assigned run and left work early without permission, (Slavin Aff., Exh. B at 150), and that another Caucasian driver, John, clocked out early eight times without permission and was not disciplined. When Lumhoo was asked the basis of this information, he stated that "there are no secrets at Home Depot." (Slavin Aff., Exh. B at 144–47). While there may be "no secrets" at Home Depot, keeping a "secret" from the Court fails to raise the claim to a credible level. Such proffers of disparate treatment made without personal knowledge and unsupported by admissible evidence, *see Wang,* 1999 WL 529550, at *14, or based on common knowledge, *see Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64 (2d Cir.1997) (holding common knowledge "with no personal knowledge of disparate treatment is not sufficient to set forth a *prima facie* case of discrimination"), are insufficient to create a genuine issue of material fact.[25] *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 160 (2d Cir.1999).

Finally, Plaintiffs' disparate discipline allegation based on Dadaille's testimony that four unidentified white employees told him that they were never disciplined for lateness is unsupported by any admissible evidence. (Slavin Aff., Exh. D at 100). Dadaille has never had access to any employee's personnel file and has no evidence

---

**25.** Plaintiffs' additional examples of an unidentified minority employee who allegedly rode a motorcycle on Company time and was fired, while an unidentified white employee who came to work intoxicated was not, likewise fails to support an inference of discrimination. Apart from the facts that Plaintiffs fail to identify either employee, and during their employment in Valley Stream, four employees (two black and two white) were terminated for substance abuse (DeLuca Reply Aff. ¶ 14), Plaintiffs are unable to show "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Graham v. Long Island R.R.,* 230 F.3d 34, 40 (2d Cir.2000).

that these unidentified employees were not disciplined. (DeLuca Reply Aff. ¶ 10). Such conclusory allegations will not suffice to defeat a summary judgment motion. *See Wang,* 1999 WL 529550, at \*14; *see also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir. 1995).

In summary, because Plaintiffs have failed to demonstrate a *prima facie* case or pretext for their disparate treatment claims under Title VII, § 1981 and the NYSHRL,[26] the Court grants Defendants' motion for summary judgment on these claims and accordingly dismisses Counts 6, 7 and 8 of the Complaint.

### (4) A Hostile Work Environment

In Counts 9, 10 and 11 of the Complaint, Plaintiffs claim that Defendants subjected them to a hostile work environment in violation of Title VII, § 1981 and the NYSHRL.

■■■■ Title VII prohibits an employer's conduct that "has the purpose or effect of . . . creating an intimidating, hostile, or offensive working environment," and "affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). To prevail on a hostile work environment claim, a plaintiff must prove "(1) that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] environment,

and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." [27] *Van Zant,* 80 F.3d at 715 (internal quotation marks and citation omitted); *see Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Meritor Savings Bank,* 477 U.S. at 67, 106 S.Ct. at 2405–06; *Cruz,* 202 F.3d at 570; *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436 (2d Cir.1999); *Perry v. Ethan Allen, Inc.,* 115 F.3d 143, 149 (2d Cir.1997).

■■■■ In examining whether an environment is sufficiently hostile or abusive, courts consider the totality of the circumstances, including such factors as "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted." *Richardson,* 180 F.3d at 437 (internal quotation marks and citation omitted); *see Schwapp,* 118 F.3d at 110–11 ("whether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment") (internal quotation marks and citations omitted); *see also Williams v. County of Westchester,* 171 F.3d 98, 100 (2d Cir.1999). Hence, "a plaintiff must demonstrate either that a single incident was extraordinarily severe,

---

**26.** *See supra* note 20.

**27.** In analyzing a hostile work environment claim brought under § 1981 and the NYSHRL, courts use the same standard of proof as applied in Title VII cases. *See Whidbee v. Garzarelli Food Specialties, Inc.,* 223 F.3d 62, 69 (2d Cir.2000); *Reed,* 95 F.3d at 1177; *Lopez v. S.B. Thomas, Inc.,* 831 F.2d

1184, 1189 (2d Cir.1987); *Woodcock v. Montefiore Med. Ctr.,* 2002 WL 403601, at \*5–6 (E.D.N.Y.2002); *Garone v. United Parcel Servs., Inc.,* 2001 WL 984914, at \*2 (E.D.N.Y. July 12, 2001); *see also Francis v. Chemical Banking Corp.,* 62 F.Supp.2d 948, 959 (E.D.N.Y.1999), *aff'd* 213 F.3d 626 (2d Cir. 2000).

or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] or her working environment." *Whidbee*, 223 F.3d at 69 (internal quotation marks and citation omitted).

### (a) Plaintiffs' Title VII Claim

With respect to Plaintiffs' hostile work environment claim under Title VII (Count 9 of the complaint), as discussed previously, the Court is limited to considering that portion of the claim which relates directly to the circumstances surrounding the September 19, 1999 incident, namely the altercation between Duffy and Plaintiffs.

According to Plaintiffs, as they were attempting to move material through the lumber aisle with a forklift, Department Head Duffy yelled at them for allegedly damaging certain lumber, cited Anderson for not wearing a seatbelt while on a forklift and stated, "You worthless niggers ... We'll deal with you later." (Compl. ¶ 44; Pl. Anderson's 56.1 Statement at ¶ 27; Pl. Lumhoo's 56.1 Statement at ¶ 34). Anderson testified at his deposition that following Duffy's comment, he

> hopped off the forklift and started the business with him, stating, Who the fuck you think you talking to? [sic] You know arguing with him. And Lumhoo was holding me. Like chill. Jim Duffy, I'm going to see you in the back later. Lumhoo said, Calm down. Chill. Don't worry about it. We are going to talk to the manager. We are going to take it to a higher level.

(Slavin Aff., Exh. C, at 108–09). Lumhoo's account of this incident similarly depicts an altercation with Duffy which Plaintiffs would address with management. Lumhoo states

> Jim Duffy said, If you want to be technical, you ain't got your seat belt on. Jim

Duffy turned around and said, You worthless niggers. Jemel said, What did you say? And I said, Don't do nothing. And then Jim Duffy kept saying, I will deal with you later. Jemel said, You can deal with me now. I said, Jemel, leave it alone. We will discuss it with a manager.

(Slavin Aff., Exh. B, at 62).

However, when Plaintiffs attempted to discuss this occurrence with an assistant manager, Clougher, another assistant manager, Joseph Gervasi, came over to the group and told Anderson, to "Shut the fuck up. What you say don't mean nothing. You are nobody. You don't matter." (Compl. ¶ 44; Pl. Anderson's 56.1 Statement at ¶ 32; Pl. Lumhoo's 56.1 Statement at ¶ 34). Additionally, Gervasi also told Anderson that Duffy was part of the management team and "what he says goes. You jump when [Duffy] says jump with no questions asked." (Compl.45).

In viewing the totality of these circumstances, Plaintiffs could have reasonably perceived, and in fact did perceive, this incident to be racially hostile. Duffy's racial epithet, "you worthless niggers," taken together with assistant manager Gervasi's statements to Anderson that, "you don't matter ... what he says goes ... You jump when he says jump," could be perceived as having fostered an abusive working environment in the Valley Stream store and as having negatively altered the working conditions of a reasonable employee. *See Richardson*, 180 F.3d at 439 ("[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of the unambiguously racial epithet such as 'nigger'") (citation omitted); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998); *Meritor Savings Bank*, 477 U.S. at 67, 106

S.Ct. at 2405; *Torres,* 116 F.3d at 631 ("even a single episode of harassment, if severe enough, can establish a hostile work environment"). Thus, because a factfinder may well conclude that this episode of harassment was severe. enough to create an abusive hostile work environment under Title VII, the Court denies Defendants' summary judgment motion on this claim.

### (b) Plaintiff's § 1981 and NYSHRL Claims

### 1) Hostile Environment

In considering the totality of the circumstances of Plaintiffs' hostile work environment claims under the NYSHRL and § 1981, the Court first examines Anderson's allegations of harassment. Specifically, in addition to Duffy's comment made on September 19, 1999, Anderson alleges that on one occasion, Duffy called Anderson and some other co-workers "[b]lack son of bitches, you fucking moolies, tar baby." (Slavin Aff., Exh. C, at 139, 294). Anderson also alleges that on another occasion Duffy called a black associate who was riding his motorcycle in the store parking lot while on duty, a "black son of a bitch" and a "nigger," (Slavin Aff., Exh. C, at 140), and Gervasi and another assistant store manager named "Andy" also called that associate "nigger," (Slavin Aff., Exh. C, at 142).

Anderson also contends that on one occasion while in the bathroom he heard the assistant manager "Andy" use the word "nigger." (Slavin Aff., Exh. C, at 161, 305–06). On another occasion, "Andy" referred to Bernie Williams of the New York Yankees as a "nigger." (Slavin Aff., Exh. C, at 161, 305–06). Further, on one Sunday morning, Anderson alleges that two assistant managers, Jim from the Gardening Department and "Andy" were talking about minority employees in general, making up words about them and calling them "porch monkeys" and "niggers." (Slavin Aff., Exh. C, at 171). Finally, Anderson alleges that a truck driver Bill called Lumhoo "that black son of a bitch." (Slavin Aff., Exh. C, at 210).

In sum, Anderson alleged seven incidents when various Home Depot management employees used the term "nigger" over a five month period, once together with "fucking moolie," and "tar baby" and once together with "black son of a bitch" and a co-worker used the term "black son of a bitch." Notably, two of the racial slurs were directed to Anderson, the remaining concerned alleged comments were directed to others. In considering the totality of circumstances, the Court observes that the mere fact that Anderson was not present when certain of the racially derogatory comments or jokes were made "will not render that comment irrelevant to his hostile work environment claim." *Schwapp,* 118 F.3d at 111–12("[I]ncidents relating to other minorities and those occurring before [plaintiff's] tenure ... cannot be ignored on summary judgment.").

With respect to Lumhoo's hostile work environment claims, in addition to the "worthless nigger" comment allegedly made by Duffy on September 19, 1999, Lumhoo alleges that two weeks earlier, Gervasi, Clougher and Duffy made a joke about "jungle bunnies." (Slavin Aff., Exh. B, at 109). In addition, Lumhoo alleges that he heard that Duffy made a comment that he got "a kick out of getting black people fired." (Slavin Aff., Exh. B, at 110). Lumhoo also charges that Duffy said "you people will never learn" and "you people will never get it right." (Slavin Aff., Exh. B, at 185–86). Lumhoo also alleges that he once overheard two assistant managers use the term "nigger" in the men's room. (Slavin Aff., Exh. B, at 103–05). With respect to the bathroom incident, Lumhoo stated,

They didn't know I was in there. And I heard Bill mention to Jim, not Jim Duffy, Jim, the assistant manager. He said, that damn nigger, Lumhoo, and this overtime. Jim responded, Don't worry about it. We are going to take care of him. That is when I walked out of the stalls. And I said, Take care of who? They just looked at me and walked out. I washed my hands. And I walked out. And I spoke to Al DeLuca. And I told him on the phone that I need to get out of that store. I don't remember what the conversation was about. I remember we talked on the phone. I need to get out of that store because they fucking with me. [sic] I don't remember the exact conversation I had on the phone. I think he said he would do everything he can to get me out of the store. And he asked me if there was anywhere particular that I would like to go to. It was explained to me that Ozone Park needed a PM Driver.... And he successfully had me transferred to the Ozone Park store.

*Id.*

It is clear that both Anderson and Lumhoo subjectively believed that their workplace environment was hostile. Thus, the question before the Court is whether Plaintiffs have set forth sufficient evidence to demonstrate an objectively hostile or abusive work environment. *See Harris*, 510 U.S. at 21–22, 114 S.Ct. at 370. As the Second Circuit instructed in *Richardson*, Plaintiffs' allegations should be examined "to determine whether a reasonable person who is the target of discrimination would find the working conditions so severe or pervasive as to alter the terms and conditions of employment for the worse." 180 F.3d at 436.

Plaintiffs contend that they were subjected to a hostile work environment because the quality and quantity of racial slurs, epithets and jokes made by Defendants were such that Plaintiffs' working conditions altered for the worse over the course of their employment at the Valley Stream store. Plaintiffs' contention is a close call.

The Second Circuit has made clear that in order "[f]or racist comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp*, 118 F.3d at 110 (internal quotation marks and citation omitted). In the instant matter, a reasonable person could find that his working conditions altered for the worse if over the course of five months or seven months, various management employees as well as a co-worker used the word "nigger" in his presence, referred to an African–American as a "moolie," "black son of a bitch," "tar baby," "porch monkey," made a joke that disparaged blacks and referred to them as "jungle bunnies," and addressed black individuals as "you people." Considered together, a reasonable person might find that these episodes were sufficiently severe and pervasive to constitute a pattern of harassment.

In light of the frequency and quality of the alleged racial conduct, *see, e.g., Richardson*, 180 F.3d at 437–39 (reversing district court's grant of summary judgment in hostile work environment action where plaintiff alleged she was subjected to ten racially hostile incidents during a three and one-half year employment, including co-workers' use of the word "nigger"); *Schwapp*, 118 F.3d at 108 (reversing district court's grant of summary judgment in hostile work environment action where first black police officer employed by the Town of Avon alleged he was subjected to ten racially hostile incidents during a ten-

month period, including his fellow officers' repeated use of the term "nigger" in his presence and the distribution of racially offensive joke); *Tomka*, 66 F.3d 1295 (reversing district court's grant of summary judgment in hostile work environment action where plaintiff alleged a single incident of sexual harassment the she was sexually assaulted by two of her supervisors), and the repeated use of the "unambiguously racial epithet ... nigger," *see Richardson*, 180 F.3d at 439 ("[p]erhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of the unambiguously racial epithet such as 'nigger' "), the Court concludes that rational jurors could infer from the totality of the circumstances that a reasonable employee would have found the environment hostile or abusive. The Court concludes that these allegations suffice to raise a material issue of fact of whether Plaintiffs were subjected to a discriminatory hostile work environment. *See id*, 180 F.3d at 437 (cautioning that because the existence of racial harassment in a hostile work environment is a "mixed question of law and fact," it is "especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue").

### 2) Employer Liability

■ Plaintiffs seek to hold Home Depot liable for the alleged conduct which created the hostile work environment. Defendants assert an affirmative defense that their response to the alleged inappropriate conduct was effectively remedial and prompt. Whether a specific basis exists for imputing this conduct to the Company is a close call.

The Supreme Court has held in two companion decisions, *Faragher* and *Burlington*, that an employer is presumptively liable for a hostile work environment "created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 805–06, 118 S.Ct. 2275, 2292–93, 141 L.Ed.2d 662 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 764–65, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998) (companion case); *see Cruz*, 202 F.3d at 572 n. 8.

As a threshold matter, relying on *Parkins v. Civil Constructors, Inc.*, 163 F.3d 1027, 1034 (7th Cir.1998), Defendants argue that even if their conduct created an actionable hostile environment, Home Depot is not vicariously liable for the alleged misconduct because none of the assistant managers or the department head alleged by Plaintiffs to have engaged in the harassment qualify as "supervisors" given they did not have "the power to hire, fire, demote, promote, transfer, or discipline an employee." Defendants reliance on this Seventh Circuit case is misplaced.

While the Supreme Court has not specifically defined the term "supervisor" for purposes of employer liability in hostile environment claims, upon a close reading of the *Faragher* decision, it is clear that the Supreme Court views the term "supervisor" as more expansive that simply those employees who have the power to hire, fire, demote or promote. *Faragher v. City of Boca Raton*, 524 U.S. 775, 777, 118 S.Ct. 2275, 2278–80, 141 L.Ed.2d 662 (1998). In *Faragher*, a lifeguard claimed a hostile work environment based upon lewd remarks and the uninvited touching by two of her superiors. *Id.* One of the superiors supervised all aspects of the lifeguard's work and had authority to hire and fire lifeguards subject to the approval of higher management. *Id.* The other superior was responsible only for scheduling the lifeguards' daily assignments and for supervising their work and fitness training,

but had no authority to hire and fire. *Id.* Although the Supreme Court did not enunciate a bright line to distinguish between a supervisor and co-worker, the Court considered both employees to be supervisors, and held the employer liable for the hostile work environment they had created. *Id.* at 805, 118 S.Ct. at 2293. Notably, the most senior superior whose harassing conduct was at issue, did not have plenary authority to hire and fire employees, but needed to secure the approval of higher management for those decisions. *Id.* at 775, 118 S.Ct. at 2279.

Similarly, in the case at bar, the evidence is sufficient to support a finding by a reasonable juror that department heads and assistant managers acted as Plaintiffs' supervisors such that Home Depot could be held liable for unlawful harassing conduct. It is undisputed that Duffy was Plaintiffs' immediate, first line supervisor in the Lumber Department. There is evidence in the record, which we construe as true for these purposes, that Duffy maintained authority to control Plaintiffs' daily activities. For example, during the September 19, 1999 incident, Gervasi told Anderson that Duffy was part of the management team and "what he says goes. You jump when he says jump with no questions asked." (Compl.¶ 45). Moreover, the record indicates that assistant managers had authority to fix working conditions, such as an employee's hours. For example, as discussed *infra,* Camacho made clear at his deposition that the assistant managers in the Valley Stream store had authority to request and approve overtime compensation for an employee. *See discussion infra,* Part III.

Further, while Gervasi may not have had plenary authority to render hiring and firing decisions, he did have authority, as evidenced by Anderson's termination, to recommend that Anderson be subject to a full range of employee discipline. Finally, the Court notes that in the Answer to the Amended Complaint, Defendants state, "Defendants Duffy, Camacho, Gervasi, and Clougher had the authority, in varying degrees, to affect certain terms and conditions of the employment of some of the employees in Home Depot's Valley Stream store." (Answer to Amended Compl., ¶ 13). In our view, there is a material issue of fact concerning whether Duffy and the other assistant managers are supervisors "with immediate (or successively higher) authority" over Plaintiffs such that liability may be imputed to the Company for allegedly creating a hostile work environment and taking no tangible employment action.

 "When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages." *Burlington,* 524 U.S. at 765, 118 S.Ct. at 2270. Thus, an employer may rebut the presumption of liability, "if it can plead and prove, as an affirmative defense, that 1) the employer exercised reasonable care to prevent and promptly correct any [racial] harassment by such a supervisor, and 2) the employee unreasonably failed to avail [himself] of any corrective or preventative opportunities provided by the employer or to avoid harm otherwise." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 (2d Cir.1998) (citing *Burlington,* 524 U.S. at 765, 118 S.Ct. at 2270; *Faragher,* 524 U.S. at 805, 118 S.Ct. at 2292–93); *see Richardson,* 180 F.3d at 442; *Woodcock v. Montefiore Med. Ctr.,* 2002 WL 403601, at *6–7 (E.D.N.Y. Jan 28, 2002). "In contrast, if the harasser is the victim's co-worker, the employer will be liable only if it is negligent, that is, if it either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Richardson,* 180

F.3d at 441 (internal quotation marks and citation omitted).

With respect to the first element of the affirmative defense, the Second Circuit has stated "[a]lthough not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of th[e] defense." *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 294 (2d Cir.1999). It is undisputed that Home Depot had a written anti-harassment policy in place at the time of the alleged harassment which was contained in its Associates Guide which Plaintiffs received during their orientation sessions. (Morway Aff., Exh. D; Exh B at 321; Exh. F at 350). This policy directed an employee who believed that he had been harassed and/or discriminated against to report the harassing conduct to management or the Human Resources department. (Morway Aff., Exh. D at 78). The existence of Home–Depot's anti-harassment policy together with, as discussed *infra*, certain of the Company's

remedial measures may be sufficient to satisfy the first prong of the affirmative defense as to employer liability with respect to some of the harassing conduct. *See, e.g., Woodcock*, 2002 WL 403601, at *6–7 (holding existence of anti-harassment policy at time of unlawful conduct satisfied first element of affirmative defense).

With respect to the second prong of the affirmative defense, the record indicates that when Plaintiffs availed themselves to the Home Depot's complaint procedures, the Company took appropriate measures, with respect to certain of the alleged misconduct, to consider the complaint to assess if there was a discriminatory animus, investigate the alleged misconduct if necessary and take appropriate remedial action. Thus, on the one hand, a reasonable juror could find that the Company's actions to either forego an investigation of a complaint because it was unwarranted [28] or to promptly investigate a viable complaint and take corrective, remedial measures [29] were proper.

28. For example, prior to September 19, 1999, Lumhoo complained to Nichols, an African American and the person designated to hear harassment and discrimination complaints in the Valley Stream store, that Duffy used the term "you people." Nichols claims she did not investigate Lumhoo's complaint because at the time of his complaint, Lumhoo did not specify a racial factual context and she was unaware that such a term was racial remark. (Morway Aff., Exh. E at 204). Because the term is not definitively discriminatory, it was not unreasonable for Nichols to conclude that the complaint did not warrant an investigation. *See Griffin v. Ambika Corp.*, 103 F.Supp.2d 297, 314–15 (S.D.N.Y.2000) ("defendants' alleged use of the phrases 'street person,' 'break up the gang' and 'you people' cannot be deemed inherently racially offensive without greater specificity as to the context of their usage"); *Pratt v. City Mission Society Inc.*, 1999 WL 1067577, at *5 (W.D.N.Y. Nov.15, 1999) (declining to con-

clude there was a discriminatory nexus between defendant's use of the phrase "you people" with subsequent adverse employment action); *see also Wilson*, 2000 WL 335733, at *6.

In addition, prior to September 19, 1999, Anderson complained to Nichols about the manner in which a department supervisor had spoken to Anderson, and again Nichols' decision that the complaint did not warrant further investigation was not unreasonable. Without Anderson showing that this action was racially motivated, Nichols was under no obligation to investigate the complaint further. *See Ticali*, 41 F.Supp.2d at 263 ("defendants may have harassed, insulted and criticized [plaintiff], but Title VII does not make employers liable for being mean or petty").

29. For example, when Lumhoo complained to DeLuca about the incident in which he overheard two assistant managers in the men's room saying that "damn nigger, Lumhoo"

Nonetheless, on the other hand, there is evidence in the record that could support an inference that the Company failed to respond in an adequate and reasonable manner to other complaints and that the harassing conduct continued after Plaintiffs made their complaints. Thus, in view of the totality of the circumstances, a reasonable juror could disagree about the reasonableness and effectiveness of the Company's overall response to the complaints. This is particularly so with regard to the Company's responses to the episodes involving Duffy's alleged harassment. The record is replete with alleged complaints of Duffy's harassing conduct directed toward minority employees at the Valley Stream store.

For example, prior to the September 1999 incident, Anderson alleges he complained to Nichols and Camacho that Duffy (i) called Anderson and some other co-workers "black son of bitches," "fucking moolies," "tar baby;" and (ii) called a black associate riding a motorcycle on Company time a "nigger" and "black son of bitch."

Lumhoo contends that during this period, Duffy (i) along with assistant managers Gervasi and Clougher, told a disparaging joke about blacks, referring to them as "jungle bunnies;" (ii) stated he got a "kick out of getting black people fired;" and (iii) referred to black employees as "you peo-

ple." Add to this, Duffy's alleged altercation with Plaintiffs on September 19, 1999, in which he characterized Plaintiffs as "worthless niggers," the fact that there is no evidence the Company took any action against Duffy prior to September 19, 1999, the fact that Camacho, the store manager, stated at his deposition that he did not investigate Plaintiffs' complaints regarding the incident because he decided that the racial allegations were not credible, (Morway Aff., Exh. R.), and the fact that following an investigation of the September 19, 1999 incident, the only action the Company made against Duffy was to discuss the incident and place a memorandum referencing the event and reiterating Home Depot's discrimination policy in Duffy's personnel file, a question arises to whether Home Depot responded in an adequate and reasonable manner to this behavior. A reasonable juror may conclude that the Company's response was "effectively remedial and prompt," but the Court cannot conclude as a matter of law that the record evidence compels only that result. *Cf. Kracunas v. Iona College*, 119 F.3d 80, 89 (2d Cir.1997).

Moreover, that there may also be a triable issue of fact concerning whether Duffy was a "supervisor" or merely a co-worker[30] does not change the result because under either standard, Home Depot is not entitled to summary judgment on

and stating that they were "going to take care of him," Lumhoo requested a transfer out of the store. DeLuca stated that he would do everything he could to transfer Lumhoo and successfully transferred Lumhoo to the Ozone Park store. Thus, the Company's response could be viewed as immediate and appropriate. On the other hand, the Court notes that in another factual setting an appropriate response may have been for the Company to have transferred the perpetrator(s), rather than the victim.

Furthermore, while the Company may not invoke corrective employer action as an affirmative defense with regard to Plaintiffs' writ-

ten complaints describing the September 19, 1999 incident because the harassment resulted in a "tangible employment action," namely Anderson's termination, to the extent that the Company's investigation of Plaintiffs' discrimination claims concerning that incident rendered Anderson's termination a mediate action that was ultimately reversed by Anderson's reinstatement, *see supra* (discriminatory discharge discussion), such corrective action could be viewed as having remedied in part the situation of which Plaintiffs had complained.

30. *See supra* pp. 156–57.

the question of liability for harassment allegedly created by Duffy. *Cf. Kracunas,* 119 F.3d at 89; 29 C.F.R. § 1604.11(d) (employers liable for harassment of co-worker if "the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action"). Even assuming *arguendo* that Duffy is considered a co-worker, Plaintiffs have offered sufficient facts that could support an inference that because assistant managers were present when certain of Duffy's disparaging comments were made, the Company knew or should have known of the discriminatory conduct (*i.e.,* Gervasi and Clougher, re: jungle bunny joke). *See Kotcher,* 957 F.2d at 64 (stating that claims "must be evaluated in light of all the circumstances," including evidence tending to show that supervisors "at least tolerated" their subordinate's unlawful harassment).

Finally, Plaintiffs have offered sufficient facts that could support an inference that because certain assistant managers actually participated in the racially offensive comments that contributed to creating a hostile work environment (*i.e.,* "Jim" from gardening and "Andy," re: used racial epithets such as "nigger," "porch monkeys;" Gervasi and "Andy," re: used term "nigger"), their behavior was part of a larger hostile work environment at the Valley Stream store that management either knew of or should of known of and have taken immediate and appropriate action. *Richardson,* 180 F.3d at 441.

Inasmuch as the complaints at issue here must be evaluated in light of all the circumstances and reasonable jurors could conclude that Home Depot's responses to Plaintiffs' complaints were inadequate, the Court cannot conclude as a matter of law that no basis exists for imputing liability for the conduct that created the hostile

environment to the Company. *See Richardson,* 180 F.3d at 441–42; *Schwapp,* 118 F.3d at 110; *Torres,* 116 F.3d at 633.

### 3) Individual Liability

 Under § 1981, in order for Plaintiffs to maintain an action against the individual Defendants, Plaintiffs must demonstrate "some affirmative link to causally connect the actor with the discriminatory action," *Whidbee,* 223 F.3d at 75 (internal quotation marks and citation omitted)), and that the Defendants' conduct was racially motivated, *see Callahan v. Consolidated Edison Co.,* 2002 WL 244604, at *3 (S.D.N.Y. Feb.20, 2002); *accord Ige,* 2002 WL 720944, at *9.

 The New York Human Rights Law provides that where an individual employee actually participates in the conduct giving rise to a discrimination claim, that individual employee may be liable for unlawful discriminatory conduct. *See Tomka,* 66 F.3d at 1317; *McCoy,* 131 F.Supp.2d at 370–71.

As discussed above, viewing as true for purposes of this motion Plaintiffs' allegations that Defendants each participated in the creation of a hostile work environment at the Valley Stream store and that Defendants' conduct was racially motivated, the Court finds that Plaintiffs have established a triable issue of material fact on their individual liability claims.

In sum, the Court denies Defendants' motion for summary judgment on Plaintiffs' hostile work environment claim brought under § 1981 and the NYSHRL (Counts 10 and 11).

### III. Breach of Contract Claim for Overtime Wages

 In Count 12 of the complaint, Plaintiffs claim that defendant Home Depot breached a series of enforceable oral

agreements made with Plaintiffs wherein Home Depot agreed to compensate Plaintiffs at overtime rates for the hours they worked in excess of eight (8) hours per day. According to Plaintiffs, on various days during their tenure at the Valley Stream store, a Home Depot store manager, assistant manager or department head would request Plaintiffs to work longer than their regularly scheduled work day on the representation that Plaintiffs would be compensated for that time as if they were working overtime. Home Depot would then breach this agreement by refusing to pay Plaintiffs at overtime rates for hours worked in excess of eight (8) hours per day and/or directing Plaintiffs to cut back their scheduled hours for the week.[31] Defendant Home Depot contends that no such legally binding agreement existed.

 Under New York law, "the existence of a contract may be established through conduct of the parties recognizing the contract." *Apex Oil Co. v. Vanguard Oil and Serv. Co.*, 760 F.2d 417, 422 (2d Cir.1985); *see also* 21 N.Y.Jur.2d Contracts § 49 (1982). "In determining whether the parties entered into a contractual agreement ... it is necessary to look ... to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 352, 361 N.E.2d 999 (1977). In making this determination, "disproportionate emphasis is not to be put on any single act, phrase or expression, but, instead, on the totality of all of

these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Id.* at 399–400, 393 N.Y.S.2d at 352, 361 N.E.2d 999. In *Brown*, the Court found that the course of conduct between the owner and subcontractor especially taken against the "continuum of events and permissible inferences, viewed in totality, brought the determination of whether there was an intent to contract within the realm of fact finding." *Id.* at 399–401, 393 N.Y.S.2d at 353, 361 N.E.2d 999,. The record in this case supports a comparable finding.

 Here, there is sufficient evidence in the record to support an inference that the parties' actions demonstrated the existence of an oral contract between Plaintiffs and defendant home Depot. The requirements for the formation of a contract under New York law include an (a) offer, (b) acceptance and (c) consideration. *See Oscar Prods. Inc. v. Zacharius*, 893 F.Supp. 250, 255 (S.D.N.Y.1995); *see also* Restatement (Second) of Contracts §§ 24, 50, 71 (1981).

### (a) Offer

It is undisputed that Home Depot management was authorized to verbally request and approve overtime compensation for an employee based on the store's need, employees were informed of this authorization and management told employees that they would be able to retain the additional hours accrued during that work week and thus accumulate overtime at the end of the week.[32] (Slavin Aff., Exh. E at 84–86;

---

**31.** Plaintiffs explained that, the management promises to the contrary, at end of the work week, Plaintiffs would be told to cut back their scheduled hours so that their total hours for the week did not exceed forty, or if their hours were over forty, their hours would be

less than they would have been had they been permitted to work their scheduled hours.

**32.** For example, Camacho stated at his deposition that in the Valley Stream store managers and assistant managers had the authority to approve overtime and explained that the

Exh. F at 33–38; Exh. G at 23–27). With respect to the requests made to the Plaintiffs, Lumhoo testified that throughout his tenure in the Valley Stream store, management (Camacho, Nichols, Holder, O'Brae, and Damazzo) asked him countless times to stay past his scheduled time (because a customer was taking too long or management needed him to make more deliveries or get orders together), Lumhoo would then ask if management was going to authorize overtime pay, and they would say, "yes." (Slavin Aff., Exh. B at 83–87). Likewise, Anderson testified that management (Nichols, Glendorf, Malcolm, O'Brae and Wayne) would ask him on numerous occasions to work in excess of his scheduled eight (8) hour day with the representation that a manager had approved that he was to be compensated at the overtime rate of time and one-half. (Slavin Aff., Exh. C at 362–403). Thus, an inference can be made that defendant Home Depot made an offer to each of the Plaintiffs at various times to work in excess of their scheduled eight (8) hours per day and to be compensated for the excess hours at overtime rates.

### (b) Acceptance

The "Punch Detail Report" for Anderson indicates that during numerous weeks,[33] there were days in which he worked in excess of eight hours per day, but such hours were computed as "regular." *See* Morway Aff., Exh.H; Pl. Anderson's 56.1 Statement ¶¶ 21–25. In addition, Plaintiffs claim in their Memorandum in Opposition, the Punch Detail Report for Lumhoo, during the thirteen (13) week period he was at the Valley Stream store, revealed there were six weeks where he worked in excess of eight hours on certain days and then showed a reduction from his scheduled hours at the end of the work week. For example, for the week of August 2 to August 8, 1999, Lumhoo worked in excess of eight (8) hours on Monday through Thursday, but worked only two and one-half (2.5) hours on Sunday. *See* Pls. Memorandum in Opposition, at 30; Pl. Lumhoo's 56.1 Statement ¶¶ 13–15. Thus, viewing the evidence in the light most favorable to Plaintiffs, an inference can be made that Plaintiffs accepted defendant Home Depot's offer.

### (c) Consideration

At his deposition, store manager Camacho testified that, "Overtime was based on need. If an associate got stuck with a customer, had to stay late, if merchandise came into receiving and had, needed to be dealt with immediately, whatever situations came up, but it was done on individu-

---

number of hours each department could have in overtime varied "because of the amount of sales, how many associates were in the store, how far over plan you are for the week, so [sic] situation was never constant, it was just based on need." Camacho also stated that in a situation where an assistant manager approved the associate to stay for overtime, "when I'm running the store, if an assistant manager asks someone to stay then they're allowed to keep that overtime." When asked if an assistant manager gave written approval for overtime, Camacho stated, "No, it's all verbal." (Slavin Aff., Exh. F at 33–38). In addition, Clougher testified at his deposition that management had the authority to autho-

rized overtime as needed, that when he was a manager at the Westbury Home Depot store and was asked by an employee, "Am I getting paid for this overtime," he had the authority to respond, "Yes," but that he did not respond yes in all instances. (Slavin Aff., Exh. G at 23–27). Finally, Nichols stated that if an employee had already put in approved overtime for a given week they would not be required to cut their hours. (Slavin Aff., Exh. E at 84–86).

33. The Home Depot week runs from Monday to Sunday.

al basis." (Slavin Aff., Exh. F at 33). Thus, it may be inferred that the consideration required under the alleged series of oral agreements can be found in the detriment to Plaintiffs in continuing to work beyond their previously scheduled eight hours for one day and the benefit to Home Depot in having unforeseen and necessary work done.

While the Court finds that the question of contractual intent in this case is a close one, particularly given Plaintiffs' failure to identify the specific dates and management employees who authorized the overtime on those dates, these facts do not necessitate a finding that no contract was entered into by the parties because this information may be available from such Home Depot's records as the Punch Detail Reports, the time reports, the non-computer generated markings on the Employee Detailed Time Report, employee time sheets, payroll reports and the like. *See* Slavin Aff., Exh. E, at 84–86 (discussing handwritten notations regarding overtime on Employee Detailed Time Reports); *cf. Oscar*, 893 F.Supp. at 255–56; *N.F.L. Insur., Ltd. v. B & B Holdings, Inc.*, 874 F.Supp. 606, 614 (S.D.N.Y.1995); *DeVecchi v. DeVecchi*, 311 N.Y.S.2d 530, 531, 34 A.D.2d 790 (2d Dep't 1970). Thus, viewing the facts alleged by Plaintiffs to be true and viewing the ambiguities and inferences from those facts in the light most favorable to Plaintiffs, the Court concludes that there is a material factual issue concerning the parties' intentions to enter into a series of enforceable agreements that should be resolved by the trier of facts. *See Bauman Assoc., Inc. v. H & M Int'l Transport, Inc.*, 567 N.Y.S.2d 404, 408, 171 A.D.2d 479 (1st Dep't 1991) (stating that "the issue of whether or not the parties ever came to a meeting of the minds so as to have entered into an enforceable agreement should properly be left to the determination of the trier of facts").

Accordingly, because Defendant Home Depot fails to meet its burden of demonstrating that dismissal on the ground of breach of contract is appropriate, the Court denies Home Depot's summary judgment motion on Plaintiffs' breach of contract claim brought under New York common law (Count 12).

### CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment in part and dismisses Counts 1 through 8 from the complaint, and denies the motion in part. In addition, in light of this Court's decision, the Court denies Defendants' motion to strike portions of Plaintiffs' Affidavits and Rule 56.1 Statements in Opposition to Defendants' Motion for Summary Judgment as moot.

**SO ORDERED.**